THE MACON AND AUGUSTA RAILROAD COMPANY, plaintiff in error, *vs.* FRANK L. LITTLE, executor, defendant in error.

JACKSON B. JOHNSON, administrator, plaintiff in error, *vs.* R. STOKES SAYRE *et al.*, defendants in error.

1. That clause of the third paragraph of the first section of Article II. of the Constitution of Georgia, which provides that "No session of the General Assembly, after the second under this Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof," applies only to the General Assembly which was to meet after the State government had been fully reconstructed under the so-called Reconstruction Acts of Congress, not to the Legislature of the provisional government organized under those Acts.

2. The Supreme Court of the United States have said, in White *vs.* Hart *et al.*, *infra*, "the action of Congress upon the subject (the reconstruction measures) cannot be inquired into. The case is clearly one in

The Macon and Augusta Railroad Company *vs.* Little.

which the judicial is bound to follow the action of the political department of the government, and is concluded by it.'' While compelled to accept this dogma as law, and as perhaps true, in a limited degree, so far as facts accomplished are concerned, as a general proposition I dissent from and protest against it.

3. Under the recent decision of the Supreme Court of the United States in the case of William White *vs.* John R. Hart and William D. Davis, decided December Term, 1871, we are compelled to hold, that the reconstructed provisional government of Georgia did not expire before June 12th, 1870, when Congress enacted that the State of Georgia having complied with the Reconstruction Acts, and the fourteenth and fifteenth amendments to the Constitution of the United States having been ratified in good faith by a legal Legislature of said State, it is hereby declared that the State of Georgia is entitled to representation in the Congress of the United States.'' Upon the admission of her Senators and Representatives under that Act, says the Court, ''the condonation by the national government became complete.'' The conclusion to our minds is inevitable, that up to the passage of that Act, at least, the provisional government provided for by the Act of March 2d, 1867, still existed.

4. It follows that the session of the Legislature of 1870, which passed the Act of October 13th, of that year, was not a session of the General Assembly, after the second under the Constitution, in the sense in which the Convention of 1868 used these words. Hence the Act under review is not invalid because passed by the Legislature more than forty days after the commencement of its session.

5. It is at least doubtful whether the first four sections of the Relief Act of October 13th, 1870, prospective in their operations, as sound rules of construction require them to be understood, so far impair the remedy of contracts made prior to June, 1865, as to be unconstitutional under the tenth section of the first Article of the Constitution of the United States. It is, therefore, the duty of the Court to refuse to declare them unconstitutional.

6. The first four sections of the Relief Act of October 13th, 1870, must be read in the light of the title to that Act, and in so far as they are not variant from it, they do not violate the fifth paragraph of the fourth section of Article three of the Constitution of Georgia, and to that extent the Court should give them effect. Therefore, in all suits pending at the time of the passage of the Act, for debts founded on contracts made prior to June, 1865, the taxes must have been paid, and the affidavit filed within six months after the Act passed; and in all suits commenced after its passage, at the time of filing the writ, on pain of having the case dismissed on failure to do so.

7. If Congress or a State Legislature pass a law, within the general scope of their constitutional power, the Courts cannot pronounce it void

merely because, in their judgment, it is contrary to the principles of natural justice: Calder *vs.* Bull, 3 Dallas, 399.

8. A bill of interpleader being filed by an administrator against the creditors of the estate represented by him, whose claims are antagonistic, and some of the claims being founded on contracts entered into before June, 1865, it is not necessary for creditors holding such claims to file an affidavit of the payment of taxes with their answers, their claims having been brought into Court by the administrator and not by themselves. On the trial of the case, however, they should make it clearly appear that the taxes have been paid to entitle them to a decree for the payment of the claims.

9. Subscriptions to the stock of the Macon and Augusta Railroad Company, made before June, 1865, stand upon the same footing with other debts contracted before that date; and in suits against the subscribers for the amount of their subscription, the payment of taxes and the filing of the affidavit, as required by the Relief Act of 1870, is necessary. WARNER, Chief Justice, dissenting.

Constitutional Law. Reconstruction complete. Expiration of Provisional Government. Relief Act of 1870. Obligations of contracts. Tax-affidavit. Tried before Judge ANDREWS. Hancock Superior Court. October Term, 1871.

The first of these cases was an action of assumpsit by the Macon and Augusta Railroad Company against Frank L. Little, as executor upon the estate of T. H. Andas, deceased, for a subscription to the capital stock of said company, made by said Andas when in life, at some time prior to June 1st, 1865, the date not appearing upon the record. When said cause was called for trial, a motion was made to dismiss the same, because no affidavit had been filed of payment of taxes under the Relief Act of 1870, which motion was sustained by the Court, the case dismissed, and plaintiff excepted.

The second case arose upon a bill filed by Jackson B. Johnson, as administrator of James Thomas, deceased, *de bonis non, cum testamento annexo, vs.* R. Stokes Sayre *et al.*, asking direction as to whether he should pay anything on such debts as appeared to have arisen prior to June 1st, 1865, unless accompanied by affidavits of the payment of the taxes. The said administrator moved to dismiss said claims when

The Macon and Augusta Railroad Company, vs. Little.

presented, upon the ground that no tax-affidavit had been filed, which motion was overruled by the Court upon the ground that said claims were not in suit, to which ruling complainant excepted.

B. H. Hill, Esq., and Henry L. Benning, Esq., having appeared in Court and stated that they represented interests which would be materially affected by the decision of the principles involved in this case, were allowed to be heard.

R. Toombs; C. W. Dubose; Linton Stephens, against the constitutionality of the Relief Act of 1870.

B. H. Hill; Henry L. Benning; Frank L. Little, contra.

Montgomery, Judge.

In these cases the Act of October 13th, 1870, commonly known as the Relief Act, is attacked, mainly on two grounds: 1st. It is said to be invalid because the session of the Legislature at which it was passed was not a session of the General Assembly, after the second under the Constitution, and that, at the time of the passage of the Act, that Legislature had been in session more than forty days without having prolonged the session by a vote of two-thirds of each House. 2d. That the Act impaired the obligation of all contracts made prior to June 1865, and is, therefore, repugnant to the tenth section of Article I. of the Constitution of the United States. It is impossible to consider intelligently the first question made without reviewing the so-called Reconstruction Acts of Congress, and ascertaining to what extent Courts are now compelled to recognize the *results* of those unconstitutional and revolutionary measures as facts accomplished, and which are now beyond the remedial power of the Courts.

1. Before entering upon that discussion, it becomes necessary to fix, with some degree of precision, the import of that clause in our State Constitution, which says "no session of

the General Assembly, after the second under this Constitution, shall continue longer than forty days, unless prolonged by a vote of two-thirds of each branch thereof." Does this mean no session of the General Assembly, after the second session under this Constitution, or no session of the General Assmbly after the second General Assembly under the Constitution? If "General Assembly" is to have the same relative meaning under the Constitution of Georgia that " Congress " is understood to have under the United States Constitution, then the latter is perhaps the correct reading.

The Congresses of the United States are regularly numbered, and each has two regular sessions. The last clause of the sentence which we are considering, would seem to strengthen this view, "unless prolonged by a vote of two-thirds of each branch thereof." Does this mean unless prolonged by a vote of two-thirds of each branch of the session? The question is debatable, it is not necessary to decide it. It may be dismissed with the general remark that, our General Assemblies are elected every two years, and organized at their first session for the entire period for which they are elected, but each holds a regular session annually. If the reading here intimated, as possibly the proper one be correct, this disposes of the question at once. No one pretends that the Legislature of 1870 was a General Assembly after the second under the Constitution of 1868. But suppose the word "session" is to be understood after the word second, in the clause under review, what, then, is meant by the words " under this Constitution"? A brief retrospect at the anomalous circumstances by which the Convention of 1868 was surrounded, explains the meaning to my mind, at least, very clearly.

By the Act of March 2d, 1867, the first of the reconstruction measures, five conditions precedent were required to be complied with before military rule should cease in the States "lately in rebellion." These have been correctly stated to be, 1st, The formation of a State Constitution; 2d, The ap-

proval of that Constitution by Congress; 3d, The ratification of the fourteenth amendment; 4th, The declaration by Congress that the State is entitled to representation; and, 5th, The final Act of recognition—the admission of Senators and Representatives, on their taking the oath prescribed by law. Section sixth of the Act then provides, "that until the people of the said rebel States shall by law be admitted to representation to the Congress of the United States, the civil governments that may exist therein shall be deemed provisional only, and shall be in all respects subject to the paramount authority of the United States any time to abolish, modify, control and supersede the same."

Article XI., sections nine and eleven of the Constitution of Georgia, fully recognizes the provisional nature of the government then forming, and that it was to remain so until otherwise declared by Congress. It is also matter of history that the Convention which framed that Constitution assembled under, and recognized the validity of the Act of March 2d, 1867. It is further matter of history that our laws were well nigh in a state of chaos, resulting from the disastrous termination of the war, and the Reconstruction Acts of Congress. Such being the condition of things during the session of the Convention of 1868, is it not obvious that they meant to make the first two sessions of the General Assembly (so to read the Constitution) of indefinite duration, in order to give them full time to bring order out of chaos, and to reconcile an unwilling people to a government forced upon them by the bayonet? It so seems to me. But will it be said that they meant that a Provisional Legislature should undertake this arduous work? Even supposing they had been permitted to finish such a work, by the very terms of the Act under which the new government was called into being, all their labor might have been lost by having the system established by them abolished, modified, controlled or superseded by the order of a military commander, or by Act of Congress. Can it be supposed that the Convention had so

little foresight as this? With great deference to adverse opinions, it seems to me impossible. When that part of the Constitution now under review was first reported to the Convention it read as follows: "The first meeting of the General Assembly shall be within ......... days after the adjournment of this Convention, etc. * * * No session of the General Assembly, *after the first above mentioned,* shall continue longer than forty days, etc.: Journal of Convention of 1868, page 122. It was amended by striking out the words "first above mentioned" and inserting "second under this Constitution:" *Ibid.,* page 318. This, perhaps, militates against the reading first suggested in this opinion. But it indicates much more strongly that the Convention contemplated meetings of the General Assembly held under some other authority than that of the Constitution.

I conclude, therefore, that the language used in the Constitution contemplated that there would be one or more sessions of the General Assembly under the Reconstruction Acts and the military commander, provisional in their character, and that the sessions of the General Assembly to be held "under this Constitution" were the sessions to be held after the iron hand of a hostile and despotic government had been withdrawn from the control of the State government. But it is said that the government was not provisional after the withdrawal of the military control over the State, in July, 1868, by General Orders, No. 55, Adjutant General's office, and General Orders, No. 103, Headquarters Third Military District, July 22d, 1868, issued by General Meade, and that this Court has decided that the State had fully complied with the Reconstruction Acts on July 21st, 1868, in Foster *vs.* Daniels, 39 Georgia, 39. The question in that case was, when did the County Courts cease, which depended upon, when did the Constitution go into operation. If, as I think I have shown, the Constitution went into *provisional* operation, before it became permanent, by permission of Congress, Foster *vs.* Daniels cannot affect the question

now before the Court.  But, unfortunately, neither the Military Department nor the Supreme Court of Georgia was the proper judge of this matter.  General Terry, General Meade's successor, thought the State had not, and recommended that the President should countermand those orders.  It was done. He further recommended that members of the Legislature, elected under General Meade, should be called together as a Provisional Legislature.  Congress, by Act of December 22, 1869, provided for so doing, thus determining the question that the government of Georgia was still provisional, under Act of March 2, 1867 ; otherwise, they could have had no warrant, under their own theory, for interfering with the domestic government of a State.  It may be added that the Legislature of 1870 was not elected, assembled, organized or sworn in under the Constitution.  Its members were elected before the adoption of the Constitution.  It was assembled under Act of Congress, of December 22, 1869.  It was organized by a military commander, who rejected whom he pleased and seated whom he pleased.  It was sworn in by a judicial officer of the United States, took oaths not contemplated by the Constitution, and did not take the oath prescribed by the . Constitution, before a State officer, as required by the Code. It undertook to act under the Constitution, so far as permitted by military authority, but no further, and was recognized only as a provisional body by the United States commander : House Journals, 1870, page 53.  His word, and that of Congress, was that of the master to the slave ; to hear was to obey.

2. Finally the Supreme Court of the United States, in the late case of White vs. Hart, have said , " The action of Congress upon the subject (of the Reconstruction measures) cannot be inquired into.  The case is clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."  While compelled to receive this dogma as law, and as perhaps now true, so far as de facto governments have been established

under those Acts, I can but lament that a co-ordinate department of the government should fail so far in its highest duty—the protection of the property, liberty and lives of the people from the unconstitutional and revolutionary encroachments of the two other departments. I differ from, and protest against, a proposition so degrading in the broad sense in which it is enunciated.

3. Under that decision we are compelled to hold that the reconstructed provisional government of Georgia did not expire before June 12th, 1870, when Congress enacted " that the State of Georgia, having complied with the Reconstruction Acts, and the fourteenth and fifteenth amendments to the Constitution of the United States, having been ratified in good faith by a legal Legislature of said State, it is hereby declared that the State of Georgia is entitled to representation in the Congress of the United States." When her Senators and Representatives were admitted under that Act, says the Court, " the condonation by the national government became complete."

The conclusion to our minds is inevitable, that up to the passage of that Act, at least, the provisional government, organized under the Act of March 2d, 1867, still existed.

4. It follows that the session of the Legislature of 1870, which passed the Act of October 13th, of that year, was not a session of the General Assembly after the second, under the Constitution of Georgia, in the sense in which those words were used by the Convention of 1868. Hence the Act under review is not invalid because passed by the Legislature more than forty days after the commencement of its session.

Counsel on the one side have earnestly invoked the Court to look to the law alone, and decide the momentous questions raised by the record, in the cases under consideration, without reference to the consequences which may result from a decision declaring these Acts unconstitutional, insisting that this Court have nothing to do with any consequences which may result. On the other hand, it is urged that the gravest

The Macon and Augusta Railroad Company *vs*. Little.

consequences will follow a decision declaring the Acts unconstitutional, which the Court should not ignore; those consequences, it is said, being no less than the overthrow of the entire State government—executive, legislative and judicial departments. That such consequences *might* possibly result, none can deny who are acquainted with our recent history, and recollect the pretexts that have been seized upon by an unfriendly paramount power to overthrow our State government more than once.

Without conceding the rule insisted on by counsel, attacking the constitutionality of the Acts in question, I have not found it necessary to resort to the *argumentum ab inconvenienti*, though no case has ever presented a stronger reason for the application of it than the present, had I doubt upon the question. The reasoning is conclusive to my mind that the objection is unsound, without that argument.

I will add that the point under discussion comes fully within the principles laid down by this Court, Judge Warner delivering the unanimous opinion of the Court, in Solomon *vs*. The Commissioners of Cartersville, 41 Georgia, 157. The question then under consideration was the power of the Governor to approve an Act after the Legislature had adjourned. In that case, the approval was more than five days after the adjournment. The eminent jurist delivering the opinion, says: "If this was an original question, independent of any construction heretofore given by the executive department of the State government, this Court would be inclined to hold that the Governor, under the Constitution, could not approve and sign any bill after the adjournment of the General Assembly; but, upon looking into the past history of our legislation, we find it has been the practice for many years for the Governor to take five days after the adjournment of the General Assembly for the revision of bills, and to sign them within that time, but not afterwards; that a large number of the most important Acts now upon the statute books of the State have been so approved and signed. This usage

and practice of the executive department of the State government should not now be disturbed or set aside." It will be observed that Judge Warner bases his refusal to declare invalid Acts approved within five days from the adjournment of the Legislature, upon two grounds: first, the interpretation placed upon the Constitution "by the executive department of the State government:" secondly, that "a large number of the most important acts now upon the statute books of the State have been so approved and signed," to declare which unconstitutional must create great confusion, is the necessary inference, and be attended by very serious consequences; though it will be observed that neither the Judge delivering the opinion, nor any member of the Court, entertained any such doubt as would justify a resort to the *argumentum ab inconvenienti* upon strict legal principles.

Two principles, applicable to the present case, are deducible from Solomon *vs.* the Commissioners of Cartersville—first, a decision by a co-ordinate department of government, upon a question legitimately within its sphere, will have great weight with this Court in sustaining the constitutionality of an Act attacked as void, because not properly acted upon by that very department. Secondly, the *argumentum ab inconvenienti* will be strained to its utmost limits to sustain Acts of the Legislature, to declare which void might produce very serious consequences to the State. The principles laid down in that case apply with much greater force to the present; here we have the decision of the *three* departments of the State government that the body of Acts passed in 1870 are valid, to-wit: the legislative, the executive and the decision of this Court in Gormley *vs.* Taylor, decided September 5th, 1871, besides a concurrence in their validity by a subsequent executive and Legislature, which has amended, repealed and refused to repeal, many of the Acts of 1870—the repeal of the one now under review being expressly attempted, and failing of success. Again, the consequences which might have resulted from declaring all Acts signed by the

The Macon and Augusta Railroad Company *vs.* Little.

Governor after the adjournment of the Legislature invalid, sink into insignificance when compared with those which might follow a decision that the entire body of laws of 1870 should be stricken from the statute book. The power of a Court to destroy is tremendous—it cannot rebuild. It should, therefore, approach with great circumspection and caution the investigation of a question in which it is called upon to sweep out of existence, at one blow, more than a hundred laws.

It is submitted that if the laws of 1870 are unconstitutional for the reason alleged, much more are the Acts of 1871 obnoxious to the same objection. The Legislature which passed the latter, came into existence under one of the former. And the Acts of 1871 were submitted to a person, as Governor, for his approval, who, by concession of counsel claiming the laws of 1870 to be unconstitutional, was not the legal Governor of the State. Again, if Judge Warner lays down the correct rule, in his dissenting opinion in Gormley *vs.* Taylor, no law passed by the Legislature at its approaching session in July can be valid, unless the adjournment in January last was by joint resolution passed by two-thirds of each House. I have not the Journals at hand, but my recollection is, that the resolution of adjournment was passed by a majority vote only.*

Judge Warner says, in that decision, "by reference to the Journals of the General Assembly, as published, which this Court is bound to recognize under the provisions of the 3762d section of the Code, the third session of the General Assembly, under the Constitution of 1868, was commenced on the tenth day of January, 1870." [The day they assembled under the proclamation of the Governor, issued in obedience to the Act of Congress of December 22, 1869.] "The Act in question was dated on the 28th day of October, 1870, more than

*Note—Since writing the text, I have ascertained that the adjournment in January, 1872, to July next, was by a majority vote only, and not in accordance with Article III., section 4, paragraph 9 of the Constitution, providing that where a vote of two-thirds is required, the yeas and nays shall be entered on the Journal.

forty days after the commencement of the third session of the General Assembly under the Constitution of 1868. After a careful examination of the Journals of the General Assembly, it nowhere appears, therefore, that the time was prolonged by a two-thirds vote." If, then, the Journals of the General Assembly, which sat in January, 1872, do not show that the adjournment over to July next was carried by a two-thirds vote, no law passed by that Legislature at its approaching session in July can be valid. It would be difficult to imagine a case where the reasoning admits of being so closely pressed to the *reductio ad absurdum.* It has been well remarked by counsel that society abhors anarchy. The logical result of the argument against the constitutionality of the Acts under review seems to me to be anarchy.

5. The next objection is, that the first four sections of the Act of October 13, 1870, impair the obligation of all contracts made prior to June, 1865, and are therefore void, under the tenth section of Article one of the United States Constitution. It is also said they impose a penalty for past delinquencies, and are, therefore, *ex post facto* in their operation. The argument is, that the first section forbids the plaintiff to have a verdict or judgment in his favor until he has made it clearly appear that all legal taxes upon the debt " have been duly paid for each year since the making or implying of the debt," etc., and that the second section requires him to file an affidavit that all legal taxes " have been duly paid" "for each year since the making of the debt," etc., and that this affixes an *ex post facto* penalty for non-payment of taxes, besides impairing the obligation of the contract, the words, " duly paid for each year," meaning paid each year as they fell due. If the Legislature intended this, they have signally failed to express such intention in the language used. Our laws provide for the payment of back-taxes at any time, and taxes due for many years may now be paid " for each year," and when paid, they are " duly," or properly, paid under the law. Doubtless many legislators

The Macon and Augusta Railroad Company *vs.* Little.

may have voted for the Act under the impression that it required a party plaintiff to swear that he had each year paid the taxes on his debt as they fell due. Indeed, the Act seems to have been skillfully drawn with a view of creating such an impression upon the minds of a sufficient number of advocates of relief to insure its passage. It is equally clear that the language used does not require him to do any such thing, but gives him six months after the passage of the Act within which to pay his taxes and file his affidavit, if his suit was pending at the time of its passage, and up to the commencement of his suit, if it is brought after the passage of the Act. Hence, the operation of the three first sections are not retroactive.

But it is said that the fourth section requires, as a condition precedent to a recovery on the debt, that the Court shall be clearly satisfied that "said debt has been regularly given in for taxes and the taxes paid," otherwise "said suit shall be dismissed." Suppose it be conceded that this section is unconstitutional, it does not help the case; the ground is fully covered by the first three sections, and the plaintiff must still pay his taxes, file his affidavit, and make the proof required by section third. But does "regularly given in for taxes" mean given in each year for taxes? "Regularly given in" surely means given in according to rule; law is a rule of action. Then, according to law, what is the law applicable to such a case? Revised Code, section 866, provides, "Receivers and collectors are required to receive the returns, and to collect the taxes thereon for former years, when any person or county are in default, which taxes shall be assessed according to the law in force at the time the default occurred;" and this, especially when taken in connection with the following section, would seem to relieve the defaulter, when he voluntarily goes forward and returns his back-taxes, from the penalty of double taxation, imposed in the event the receiver discovers the property withheld from taxation and

returns the owner as a defaulter, under section 839 of the Code.

I think I have shown that the first four sections of the Relief Act of 1870 are prospective in their operation. Do they impair the obligation of a contract? This question is more delicate. It is not to be doubted that the States may pass laws affecting, to a certain extent, the *remedies* on contracts. To *what* extent the Supreme Court of the United States, at least, have left undetermined: Von Hoffman *vs.* City of Quincy, 4 Wallace, 553. In that case the Court says, "No attempt has been made to fix definitely the line between alterations of the remedy which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances." Again, upon the same page, the Court says it is only that "legislation which affects the contract directly, and not incidentally or only by consequence," which is void. Once more it says, "it is also settled that the laws which subsist at the time and place of the making of·the contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms:" Page 550. Now, then, how far does the Act in question affect the remedy? It requires the taxes, which the plaintiff has been derelict in paying, to be first paid before he shall be entitled to his remedy. The payment of these taxes was required by the law at the time the contract was entered into. The Legislature have the undoubted right to enforce the payment of taxes; the Act is but a mode of doing that. True, *the indirect* effect of the Act is to induce persons who have long neglected their duty to the State, to abandon their claims rather than pay the taxes, and no doubt the Legislature foresaw this consequence and availed themselves of the method to afford relief to a ruined and bankrupt people. Those who have defied the law and allowed six months to pass, when they had suits pending, without paying the taxes, may have lost their claims, not by

any provision of this Act, however. So far as it is concerned, they may now pay their taxes and re-commence their suits. But it is said the Limitation Act of March, 1869, will now bar those claims, and thus the entire remedy is destroyed. Would not, then, the constitutional objection come better when that Act is pleaded? Or, if not, has the plaintiff any one to blame but himself?

Much has been said of the dishonesty of the Act, and yet no excuse is offered for the refusal of the plaintiffs to render unto the State her dues. Because she has been indulgent to these defaulters in not hitherto forcing them to pay their just proportion of the burdens of government, they now claim the right to collect their debts, *including the proportion of them due to the State*, without paying the State's own money into her treasury! They claim the right to force *their* debtors to pay the uttermost farthing, and yet have gladly availed themselves of the indulgence on the part of the State to themselves, and still claim that indulgence as a right. The parable of the unmerciful servant here finds its apt illustration.

The case of Livingston *et al. vs.* Moore, 7 Peters, 469, bears some analogy to the present one. There the plaintiffs, as heirs of John Nicholson, sued the defendant in ejectment, in Pennsylvania. Nicholson had been Comptroller General of Pennsylvania, and had resigned, owing the State a large amount. After his appointment a statute of the State was passed giving the State a lien upon his property for the amount due by him. The State then sued him and he confessed judgment. After that another statute was passed, appointing commissioners to take possession of his lands, (of which he had a large amount,) and report the condition of his accounts to the Governor, who was, by the provisions of the statute, to issue an order to the commissioners to sell the land. This was done, and defendant bought. His title was attacked by the plaintiffs on the ground that the statutes of the State above mentioned were unconstitutional, as impair-

386 SUPREME COURT OF GEORGIA.

The Macon and Augusta Railroad Company vs. Little.

ing the obligation of three contracts existing between the State and Nicholson: first, his appointment as Comptroller General under laws defining his liability at the time; secondly, the State's grant of the land to him; thirdly, the acceptance by the State of the confession of judgment. The Court says, "The body politic has its claims upon the constituted authorities as well as individuals; and if the plaintiffs' course of reasoning could be permitted to prevail, it would then follow that provision might be made for collecting the debts of every one else, but those of the State must go unpaid, whenever legislative aid became necessary · to both. This would be pushing the reason and nature of things beyond the limits of natural justice :" page 551.

The Stamp Act of Congress of June 30th, 1864, is certainly more obnoxious to the constitutional objection here raised, than the Act of October 13th, 1870, of our Legislature. The Act of Congress not only imposed a tax on notes, etc., made before its passage, but also required an additional tax to be paid in shape of a stamp upon the writ, when the holder brought suit on pain of a dismissal of the action. But it is said the intention of the Legislature was to destroy these contracts made prior to June, 1865, and that intention being unconstitutional, the Act is void. It seems to me counsel do not draw with sufficient accuracy the distinction between the intention to do an act, and the obvious consequences which may result from the act when done.

The intention of the Legislature was manifestly to deny the use of the Courts to creditors, in this class of contracts, until they had paid all back taxes due on such contracts. The result of such denial has been that many have abandoned their claims. It was not compulsory upon them to do so. Many, it is true, misread the law and supposed it required that the taxes should have been each year paid to enable them to maintain their suits. A glance at the title, which, under our Constitution, controls the body of the Act, would have disabused their minds of that idea, even supposing the body

The Macon and Augusta Railroad Company *vs.* Little:

of the Act could be so construed, which I think I have shown is not true. Many litigant plaintiffs have paid their taxes and thus retained their suits in Court. It is by their cases that the constitutionality of the Act must be tested. If the Act " so changed the nature and extent of their existing remedies, as materially to impair their rights and interests," then it is void. If " when the contracts here in question were entered into ample remedies existed," and by the Act " all were taken away, not a vestige was left, every means of enforcement was denied," clearly the Act is unconstitutional: White *vs.* Hart, United States Supreme Court, December 7, 1871. This cannot be said. Suits are now pending or have gone to judgment, which have come under the operation of the Act, and have weathered the obstructions thrown in their way by its provisions. Keeping in mind that " the duty which the Court is called upon to perform, is always one of great delicacy, and the power which it brings into activity is only to be exercised in cases entirely free from doubt," I cannot say that the remedy is so materially affected as to leave my mind without very serious doubts as to the validity of the objection that the law impairs the obligation of contracts. Indeed, the weight of the argument is, to my mind, in favor of the constitutionality of the Act. It therefore is my duty to refuse to declare the Act unconstitutional.

6. If I am mistaken in my reading of the body of the Act, it undoubtedly is to be understood in the light of its title and controlled by it. That is so plain that he who runs may read. It denies to debts, contracted before June, 1865, "the aid of the Courts *until* the taxes have been paid." Supposing, then, the words in the body of the Act legitimately bear a retroactive interpretation, "yet on a sound construction of every Act of Parliament, the words in the enacting part must be confined to that which is the plain object and general intention of the Legislature in passing the Act; and the preamble affords a good clue to discover what that object was:" Broom's Legal Maxims, 247. Under our Constitution the title affords

a controlling clue to discover what that object was. *Quando res non valet, ut ago, valeat quantum valere potest.* To the extent of the title, then, the Court should give effect to the first four sections of the Act. Therefore, in all suits pending at the time of the passage of the Act, for debts founded on contracts made prior to June, 1865, the taxes must have been paid, and the affidavit filed within six months after the Act passed, and in all suits commenced after its passage, at the time of filing the writ, on pain of having the case dismissed on failure to do so. The law, if variant from its title, is invalid only to the extent of the variance, 4 Georgia Reports, 26 ; 12 *Ibid*, 36.

7. Much has been said of the corrupt motives by which the Legislature which passed this Act was controlled. If Congress or a State Legislature passes a law within the general scope of their constitutional power, the Courts cannot pronounce it void, merely because, in their judgment, it is contrary to the principles of natural justice. "There are but two lights in which the subject can be viewed : First, if the Legislature pursue the authority delegated to them, their acts are valid. Second, if they transgress the boundaries of that authority, their acts are invalid. In the former case they exercise the discretion vested in them by the people, to whom alone they are responsible for the faithful discharge of their trust, but in the latter case they violate a fundamental law which must be our guide whenever we are called upon as Judges to determine the validity of a legislative act :" Calder *vs.* Bull, 3 Dall, 399.

Again. "That corruption should find its way into the governments of our infant republics and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored."

"It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements operating on members of the supreme

sovereign power of a State to the formation of a contract by that power are examinable in a Court of justice. If the principle be conceded that an act of the supreme sovereign power might be declared null by a Court in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of its members? Would the Act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?

"If a majority of the Legislature be corrupted, it may well be doubted whether it be within the province of the judiciary to control their conduct, and if less than a majority act from impure motives, the principle by which judicial interference would be regulated is not clearly discerned." "It would be indecent in the extreme, upon a private contract between two individuals, to enter into an inquiry respecting the corruption of the sovereign power of a State." With much more to the same effect, in Fletcher *vs.* Peck, 6 Cranch, 130. Chief Justice Marshall delivering the opinion.

8. It only remains to be added, as more exclusively applicable to the cases under consideration, that where a bill to marshal assets has been filed by an administrator against the creditors of an estate represented by him, whose claims are antagonistic, and some of the claims are founded on contracts entered into before June, 1865, it is not necessary for creditors holding such claims to file an affidavit of the payment of taxes with their answers, their claims having been brought into Court by the administrator, and not by themselves. On the trial of the case, however, they should make it clearly appear that the taxes have been paid, to entitle them to a decree for the payment of the claims.

9. Subscriptions to the stock of the Macon and Augusta Railroad Company, made before June, 1865, stand upon the

same footing with other debts contracted before that date; and in suits against the subscribers for the amount of their subscription, the payment of the taxes and the filing of the affidavit, as required by the Relief Act of 1870, are necessary. Judgment in the case of the Macon and Augusta Railroad Company *vs.* Frank L. Little, executor, affirmed. Judgment reversed in Jackson B. Johnson, administrator *vs.* R. Stokes Sayre, on the ground that the creditors, holding claims founded on contracts made before June, 1865, should have proved payment of taxes on those claims to entitle them to a decree for the payment of the claims.

McCAY, Judge, concurring.

The validity of the Act of October 13th, 1870, requiring an affidavit to be made that all legal taxes have been paid upon any debt, dated before June, 1865, on which a suit is founded, on pain of the dismissal of the suit, is attacked upon two grounds:

1st. It is said to be in violation of Article I., section 10, paragraph 1, of the Constitution of the United States, prohibiting *ex post facto* laws and laws impairing the obligation of contracts.

2d. It is said to be invalid because the session of the General Assembly—the session of 1870—had been in session more than forty days at the date of its passage, without any two-thirds vote of each House prolonging the session, which it is claimed is required by paragraph 3, Article III., section 1, of the Constitution of this State.

The decision of the first point turns, in my judgment, almost entirely upon the meaning of the law. If the necessary construction of it requires that it be understood to enact that if the holder of a debt have, during any particular year since the debt was contracted, or during the entire period since that time, neglected or refused, at the precise time, provided by law for so doing, to give in and pay the legal taxes due thereon, the suit shall be dismissed, then I think

The Macon and Augusta Railroad Company *vs.* Little.

the argument is strong with the plaintiff in error. But we have held that, construing the Act by its title, by the nature of its provisions, and, above all, by that well settled rule which makes it the duty of Courts, in declaring upon the validity of an Act of the General Assembly, so to construe it, if possible, as to make it conform to the Constitution, *it* has no such meaning as is contended for. That it is prospective only in its operation; that it denies the use of the Courts *until* the taxes are paid, and not because they have not been paid; that the holder of a debt, not in suit, or of a judgment, may at any time pay the legal taxes due, and commence his suit, or levy his *fi. fa.;* that if his suit was pending at the passage of the law, he had six full months, within which, if the taxes were unpaid, to pay them, and make the affidavit required. We have held, also, that in cases where it was impossible he should know whether the taxes were paid or not, he was only required in his affidavit to cover such time as came within his power to know. And after labored argument and mature deliberation, we see no reason to change our opinion upon the proper construction of this Act. The form of the Act is to require every plaintiff in a suit, at the time it is brought, or if pending, at the date of the Act, then, within six months, to make an affidavit that all legal taxes due on the debt *have been* duly and regularly paid, on pain, not of losing the debt, but simply of the dismissal of that suit. The terms of this law can be complied with by any one, who, *at the time the affidavit is filed*, can truly make the oath, and even if his suit be dismissed, if at any time *thereafter* he can truly make the oath, he can commence again.

The title of the Act, so far as it pertains to this part of the law, declares it to be an Act to deny the aid of the Courts to a certain class of contracts, not because, but *until* the legal taxes due thereon have been paid. And the body of the Act permits the party to go into Court with his suit, or if in, to go on with it *whenever* he is ready to swear that the taxes

have been duly and regularly paid. As to pending suits, it is true a time is limited; but each suitor has full six months within which to qualify himself to make the affidavit, by paying to the public the debt he owes for taxes upon the contract he is seeking to enforce. The words used in the Act are, "duly and regularly paid." In another place, "duly paid for each year," and again, "regularly given in for taxes and the taxes paid;" and again, section 5, "duly paid."

It is said no man can truthfully take the oath required, unless he have given in and paid the taxes at the precise time, and in the precise manner provided by law, and not if he have given and paid them at some other time and manner permitted by law. Under this view no man can say he has *duly paid* his tax for any year, if he has waited until a *fi. fa.* has issued against him, or if he has failed to give in, and has been double taxed as a defaulter, and *duly paid* that; or if he has waited till after January, as thousands do every year, and paid the tax of 1868 in 1869. In either of these cases, there is a deviation from the ordinary mode of giving in or paying.

The ordinary time for giving in is by the 1st of July, (Code, 830,) but any one may give in to the Clerk at any time after this before the digest is made up, which is by the 1st of August: Code, 840, 845. So as to paying, the ordinary time is by the 1st of October: Code, 830. But how many persons in all the counties, good law-abiding men, too, fail to pay by that time? Indeed, a long experience as a county officer, informs me that but few persons pay before the 1st of October. Now, it seems to me, there is not a man in the State who, if he had given in to the Clerk, or had paid his tax, say for 1868, by the 1st of November, or any time in 1868, or even in 1869 or 1870, would not feel free to swear that he had regularly given in and paid his tax.

To give the Act the construction contended for, would be a species of word construction and hypercriticism, almost unheard of in modern times. It would be *straining* the lan-

guage of the law in order to make it have an unconstitutional meaning, when directly the opposite is the settled rule for the construction of laws. I will not say such a meaning cannot be given to it, but I will say that such a meaning is not a fair construction according to the established rules for construing statutes. Anything may fairly be said to be duly and regularly done, which is done as permitted by law. A man is duly elected to an office, if he receive a majority of the votes at an election had at the legal time by proper officers, though there may be great irregularities· in the manner of holding the election.

Had the Legislature intended the meaning insisted on they would have used the imperfect "were duly paid," and not the perfect "have been," which, whilst it expresses as past time, also conveys an allusion to the present. A marriage is good, though there be no license, as provided by law, and parties so married are duly and regularly married, even though this important provision of law is not complied with. If a man has paid all his debts, even after they are due, or in something less than money, or even at a discount, by consent of the creditor, is it an improper use of language for him to say that his debts have been duly and regularly paid? Is the man who is entitled to a deed on the *due* payment of a note, not entitled to it if he pay the note after it is due, or if he tender the money after it is due? Is it not the uniform construction of the Courts that (in cases where the parties *may*, by the use of proper words, make time the essence of a contract,) the use of the word duly, does not do it? That may be very fairly said to be done duly and regularly, if done as the law points out, or if not, as the law permits. Our Code, section 866, permits any tax-payer to give in and pay taxes he owes to the State for past years. And specially makes it the duty of the receivers and collectors to receive and collect such over due taxes. I conclude, then, that it is a fair and reasonable construction of these words, to say that they mean "fully" all that is due, "completely," so that the

account between the State and the party is, in a substantial sense, duly and regularly settled. Any other construction would make the Act different from the title, would make it *ex post facto,* and would be contrary to the well settled rule that the Legislature is not to be presumed to have intended to pass a void law, and that other rule, equally well settled, that the most free construction of an Act may, and ought to be resorted to rather than to admit such a sense as will make the law unconstitutional. These are familiar rules and are supported by abundance of authority.

I am, therefore, *driven* to the conclusion that this Act is prospective *only.* That it imposes no penalty for any past act, and is not, therefore, *ex post facto.* Very nearly the same line of thought is conclusive, also, upon the other objection to this law, to-wit: that it imposes new conditions upon the contract, and denies the remedy except upon terms that did not exist at the date of the contract, and therefore impairs its obligation.

It must be remembered that this Act imposes no tax. It only requires the payment of such taxes as are legally due by laws passed in the ordinary course of legislation. For twenty years we have taxed all *property ad valorem,* and debts being property, have always, since the *ad valorem* system was adopted, been taxed as other property. The taxes required by this Act to be paid are the taxes due the State—due last year, due year before last, and perhaps for other years before that. They are due now just as much as they were then. The fact that the tax payer failed to return a note to the Tax Receiver, or that he has allowed his tax for any one or more years to go unpaid, does not clear him of the liability.

It is notorious, that this class of property—debts, notes, bonds, judgments, etc., are most shamefully hidden from the Tax Collector. They are easily hidden. It is notorious, also, that debts contracted before June, 1865, have been specially concealed. Various expedients have been tried by the Legislature to force notes, debts, bonds, judgments, etc., to

The Macon and Augusta Railroad Company *vs.* Little.

bear their share of the public burdens. The oath of the tax payer is appealed to—he is required to *give in* his taxable property. If he fails to do this, and it can be found, it is double taxed. But many persons have been in the habit of risking double tax rather than reveal their secret property. To meet this, the officers are required to find out all they can, then double tax it—next year double that, and so on, doubling each year, until the tax payer is compelled to show his hand.

If these taxes, which in many instances have been thus accumulating for years, are really due—and nobody can doubt this—can it be said that the State can use no remedy to enforce the payment of them except such as existed at the time the tax first became due? Surely not. The State, finding all other remedies inadequate, and knowing that to a very large extent these debts are and will be in suit, says to the owners of them : You owe taxes to the State on these very debts you are putting the country to the expense and trouble to enforce; pay these taxes or you shall not go on! Had the holders of these debts come up to the rightful demands of the State—had they, on the passage of this law, sought the Tax Collector and Receiver, given in their debts as property for taxation, making a clean breast of it for the past, the State would have reaped the benefit. But they have chosen to do otherwise; they grow indignant at this imposition, and determine to litigate to the bitter end their constitutional right to refuse to bear their share of the public burdens, and yet claim, with great gravity, the public protection. They refuse to pay the tax, or if they have already paid it they stand upon their dignity, or their rights, and refuse to make the affidavit, and come before this Court asking us to remove this obstacle which the Legislature has thus placed in their way. Our reply is, the obstacle is one of your own making, and it is not in our power to remove it. The Act is a legitimate exercise of the power of the State to force its defaulters to pay to it their tax. That the remedy the State has chosen

falls upon the contract, that incidentally it works delay to you in the collection of your debt, is not the fault of the law, but is caused by your own willful, persistent refusal to pay to the public its just demands against this very debt.  If the taxes have, in some instances, got so large that you would rather loose the debt than pay them, it is only the stronger reason why you should not go on, since the debt belongs to the State.  And in such cases remember the tax is still due whether you go on or not.  You have only exposed yourself to the public authorities, and this very exposure is notice to the Tax Receiver and Collector that you are behind with the State, and ought to be inquired after.

I hold, therefore, that this Act impairs no obligation of a contract.  It clearly does not affect its terms, and if, as I have undertaken to show, the Act is a legitimate exercise of the powers of the State to enforce the payment of its taxes, the fact that it effects the remedy is no objection to it.

Judge Swayne, in Von Hoffman *vs.* City of Quincy, 4 Wall, 553, where he announces the proposition that any law which lessens the value of a contract may be said to impair the obligation, immediately adds, "but this is to be understood of laws which do so directly, and not when the injury is incidental." And he gives the case of an abolition of imprisonment for debt as an instance of what he means.  Here the debt may be seriously lessened in value.  Imprisonment may have been, and, indeed, often was, the only effectual remedy in the power of the creditor, and the abolition must, of necessity, seriously lessen the value of the debt.  And yet Judge Swayne, in the very next breath after announcing the rule and the qualification, gives the abolition of imprisonment for debt as one of the instances of State legislation not in violation of the Constitution.

The true rule, as I understand it, as gathered from a careful study of all the cases decided by the Supreme Court, is, 1st. The State cannot, by legislation, affect the *terms* of the contract, in the slightest particular.  In respect to the actual

The Macon and Augusta Railroad Company *vs*. Little.

agreement of the parties, that is unalterable by legislation. It is not, so far as this is concerned, a question of degree; the power to affect at all is denied. But, as the remedies are, of necessity, matter largely in the discretion of a State, the rule as to them must, necessarily, stand on a different footing, since *any alteration* of the remedy may, *to some extent*, affect the rights of the parties at the date of the contract.

In legislating, therefore, upon the remedy, which *all* the decisions acknowledge to be within the legislative power, the alteration of the law must not be of such a character as does indirectly what may not be done directly. To say that, in altering the remedy, nothing can be done which lessens the value of the debt, is to deny the power over the remedy altogether. In this respect, therefore, the question is one of degree, and the rule is, that the legislation is void if it does not leave to the creditor a substantial remedy. It is true this is not a very definite rule, since it leaves every case to the conscience of the Court. But it is the only rule compatible with the acknowledged right of a State to modify its remedies at discretion.

In the case at bar, it was notorious, as I have said, that the State was defrauded of its taxes upon this class of property. It was easy to hide, and it was largely hidden from the Tax Receiver and Tax Collector. Various remedies were tried and failed. At length, in view of the fact, that when the aid of the Courts was sought to enforce a debt, there was, of necessity, an exposure of the property to the public eye, the remedy of this Act was adopted. The law is a good one. It is no hardship on an honest man. It merely says to him, as the United States says in the Stamp Act, pay your tax, or you shall not go on with your suit. Even if it imposed a new tax, which it does not, in what would it differ from the United States Internal Revenue Act of 1862? That Act required a fifty cent stamp on every process, and the Courts of all the States, as well as the Courts of the United States, were required to refuse to admit papers, and some of them

made before the date of the Act, in evidence, until they were stamped according to the Act. Except for the perverse determination of the holders of these claims not to obey the law and pay to the State the taxes due on these very debts, this Act would have secured to the State a handsome revenue.

My own opinion is, that this Act ought to be extended to all debts, and the money-lender and note-shaver be brought to bear his share of the public burdens, and this is the more proper, since it is by the right to sue, and the fear of its exercise, that his debts are of value to him.

The question of the legality of the session of the Legislature of 1870, after forty days from its commencement, is of the utmost importance. It so happens that during that session and after the forty days, an Act was passed changing the time fixed in the Constitution for the general election, as well as an Act changing the time fixed in the Constitution for the annual meeting of the General Assembly. Both of these Acts, though expressly authorized by the Constitution, are void, if the Acts of that session passed after forty days are void. The present Legislature was elected under one of these laws, and held its session of 1871 under the other. Thus elected and thus meeting, the present Legislature passed an Act authorizing a special election to be held for Governor, to fill the unexpired time of Governor Bullock, and Governor Smith is now, by virtue of his election under that law, the Governor of the State. Without this action Mr. Conley would, under the Constitution, perform the duties of that office until the regular election for Governor. Governor Smith, thus elected, has appointed a majority of the Judges of this Court. It may also be stated as another fact, that the session of 1870, after the forty days, changed the time of the meeting of the Supreme Court, and this Court, since its session in January, 1871, has met and is now in session under and by virtue of that law. If the Legislature, at its session of 1870, was illegally in session after forty days from its commencement, and if its Acts dur-

ing that session are illegal, it would seem to follow that the Acts of the present Legislature stand upon the same footing, as *it* was elected and has held its meetings at a time different from that fixed by the Constitution. The same line of reasoning applied to the session of 1870, would render invalid the Acts of the present Legislature. The Governor and the Supreme Court fall by the same logic. The result is that every branch of the government, legislative, executive and judicial, is, if the Acts of the session of 1870 are void, illegal and without constitutional authority. So startling a consequence calls for great hesitation. One cannot but suspect some error in a conclusion, the logical results of which are anarchy and confusion. My own mind is well satisfied that the session of 1870 did not need to be prolonged by a two-thirds vote. But my judgment in this case is put upon what I deem stronger and more impregnable ground. It is my conviction that, under the Constitution of the State, the judiciary has no power to pass upon the question of the legality of the Legislature, and that the decision of the body itself, whether made directly as was not done in this instance by a solemn vote of each House, or even indirectly, as if the body continue in session. after the expiration of the forty days, is conclusive whether right or wrong.

The form in which this question is made does not fairly present the real issue. A particular law is attacked on the ground that it is unconstitutional, and this is said to be so because it was passed by the General Assembly at its session in 1870, more than forty days after the commencement of the session, the same not having been prolonged by a two-thirds vote. This is not a question of the constitutionality of a law, but of the legality of the Legislature. The question is not whether the law is within the scope of legislative power— whether its provisions contravene any constitutional guarantee, or violate any constitutional prohibition. The question is not whether the Legislature, in passing it, conformed to the requirements of the Constitution as to the mode and

manner of passing laws, whether the title and the body of the Act conform to each other, nor whether there be two subjects matter in the same bill; but the point insisted upon is that the Legislature, at the date of its passage, was illegally in session—that it was no Legislature—that it had no power to pass laws, and that not only this but all its other Acts, passed after the expiration of forty days, are void.

I have been thus particular in stating the question because I think much of the apparent strength of the argument of those who attack this law is derived from the notion that they are assailing the constitutionality of a law, when, in truth, they are assailing the legality of the Legislature which enacted it.

It is not only the right but the solemn duty of the Courts to pass upon the constitutionality of laws. But the constitutionality of a law and the legality of the Legislature which passed it are wholly different things. Over the former, the judiciary has jurisdiction; over the latter, in my judgment, it has not. Very serious question has been made whether Courts, in their inquiries into the constitutionality of laws, are not confined to an examination of the law itself, as it appears on the statute books. It has been contended by learned Judges that while Courts may inquire if the *provisions* of a law are contrary to the Constitution, and, (still keeping to the Act as it appears upon its face,) whether the body of it conforms to the title, and whether there be more than one subject matter, etc., that this exhausts their authority. They cannot go behind the Act itself, examine the journals of the two houses, or learn from other sources whether the Legislature conformed, in its passage, to the constitutional requirements as to the mode and manner in which bills shall be introduced, read and voted upon.

And this limitation upon the power of the judiciary would seem entirely consistent with section 32 of our bill of rights, which provides, " that *legislative Acts*, in violation of this Constitution, are void, and the judiciary shall so declare

them." There is an obvious distinction between a "legislative Act" and the mode in which that Act has been introduced, read and voted upon. But, though, as I have said, this distinction has been drawn, I am inclined to think the weight of authority is in favor of the right of the Courts to go, at least, to the journals and inquire if they show the proper and constitutional proceedings to have been had *on the passage of the law*.

But the cases are uniform that the journals are conclusive; that, however untrue, in fact, the journals may be, they are to be taken for true, and nothing will be heard in contradiction of them; and this upon principles of public policy, and respect of one branch of the government for the other, as well as upon the further principle that even Courts, in the search after truth, recognize finalities behind which they will refuse to look. But, as I have said, the question made in this case is not really upon the constitutionality of the law, as to its provisions, or its title, or even as to the mode in which it was introduced, read and voted upon, but upon the constitutionality of the Legislature itself—upon its authority to pass any Acts. Being, as it is claimed, in session contrary to the Constitution, it was not, at the time, a legislative body at all, but a mere mob, incapable of making laws of any kind.

Is it competent for the Courts to decide upon the legality of a session of the Legislature? I think not. It was admitted by the two able gentlemen who, with such ability, argued this case against the validity of this law, that there are some questions upon which the decision of the Legislature is conclusive; so that, even if it decides wrong, no other tribunal can re-examine them. The Constitution expressly says that each House shall be the judge of the election and qualification of its own members. It was, in the argument by Mr. Stephens, admitted that, for a wrong judgment in such a case, there is no remedy, and such is, without doubt, the universal opinion. And yet the Constitution does not

say each House shall be the *exclusive* judge, even of the election and qualification of its members. Upon the principles asserted in the general argument, to-wit: that the Courts must inquire into the truth and judge for themselves, however it may be, that other branches of the government must also judge for themselves, it seems to me that if a case arise where a law is attacked, on the ground that it was passed by the votes of members of one or the other House, who were not legally elected, that the inquiry cannot be declined, since, as I have remarked, the power given to each House over the subject is not, in terms, exclusive. The truth is, the object of this constitutional provision was not so much to confer this power, and to confer it exclusively against the Courts and against the executive, as to confer it upon each House, to the exclusion of the other. It needed no provision to protect the Legislature against the scrutiny of the Courts on this subject. It must, in the nature of things, be in the power of a legislative body to declare, and declare conclusively, who compose it, and whether it is properly organized and in session according to the Constitution and laws. Such questions enter into its very existence, and MUST be decided before it proceeds to business, and to make them the subject of review before the Courts, is not only to make all legislation uncertain and inconclusive, but to exalt the Courts to supreme power in the State.

But it is said that this Court is bound by its oath of office to see to it that the plain letter of the Constitution is not violated, and that no Act can have the force of law if it be the product of a Legislature in session in violation of the Constitution. It has been asked if a Legislature, five years hence, when the first two sessions will, without question, have been held, should hold a session and pass laws, more than forty days after its commencement, without a constitutional prolongation, would such laws bind the Courts? In reply, it *might* be said, this is not such a question. In this case there was a hot dispute over the matter; men honestly dif-

fered as to the truth of the case, and the decision was made. It has, too, been acted upon for two years by the people, by the executive, and by this Court, until it has become a *fait accompli;* until it has entered as such into the whole organization of the State, in its legislative, executive and judicial departments, so that to disturb it is to inaugurate anarchy. But a question is not an argument. To suppose that a grant of power will be abused; that a wise and salutary rule, adopted for sound reasons of public policy, will be wickedly and recklessly perverted by the General Assembly of the people, is no argument against the existence of the grant. It may be a good reason for refusing to give it, but to argue that because it may be abused it does not exist, is very weak logic. Suppose this Court were to give a judgment plainly wrong, would it not be nevertheless binding upon the parties? Nothing is better settled, as a rule of law, than that the judgment of a Court of competent jurisdiction is conclusive, no matter whether it be right or wrong. Not a term of this Court passes in which we do not hold that such a judgment cannot be inquired into. It may be a wrong judgment, founded on mistake of law or fact, yet, the rule is uniform that it is to be treated as true and right. Whether it be so in fact or not, the Court refuses to inquire.

Is this a bad rule? Is this the sanction of illegality and wrong? Or, is it any reply to this rule to say that under it decisions may be made and be final, of gross and outrageous illegality? Does it at all follow that if it be admitted, that the decision of such questions by the Legislature is conclusive upon the Courts, they will be decided wrong? Are not the members of that body under oath, and is it to be presumed that they will disregard that oath? Is the Constitution less safe in their hands than in the hands of the judiciary? Is a provision of the Constitution, evidently intended, not as a limit upon the legislative power over the citizen, or as a rule to be observed in the passage of laws, but a provision to secure a diligent attention to business and

The Macon and Augusta Railroad Company *vs.* Little.

to spare the public purse, more apt to be obeyed under a power in the Courts to enforce it, than under the power of the ballot to punish its infraction ?

In every government, power must be trusted somewhere. There must *always,* upon *every* matter, be a final arbiter from whom there is no appeal, except to the people or to arms. This Court treats as final the final judgment of even a Justice of the Peace upon a matter within his jurisdiction, no matter how wrong it may be. It will not hold it to be right; it simply refuses to enter upon an inquiry on the subject.

The truth is, this world is full of *ultimata,* and human life and human society would be a curse without them.　There are *ultimata* in philosophy, morals and politics.　The profoundest philosopher must assume the existence of matter, though he can know nothing of it but that it has certain qualities.　We all live upon land wrested by wrong from the Indians; our whole social and political polity, until the late war, was based upon what nobody ever undertook to defend, the African slave trade.　And there are but very few of us who can trace our title to anything very far ere we find the channel through which it has come sadly befouled with fraud and crime.

But it is in politics that *ultimata* are found most necessary for the public good.　There is hardly a government in the world that can show a regular chain of title to its powers. Illegitimacy is written in deep imprints upon almost all of them, and the wandering Bourbons, who for nearly a century have been asserting the rights of legitimacy and regularity, have become a type of folly and imbecility. Lord Summers' call of the Parliament of 1688, irregular and illegal as it was, dethroned the Stuarts and established English liberty, and the history of English law and of English liberty is full of just such irregularities, which having entered as an element into the very texture of the government, have become *ultimata,* which are treated as legal, whether they be in fact so or not.　If the irregularity be great, we call it a revolu-

tion, and accepting the result shut our eyes to the past. But if closely looked to, every successful illegality is a revolution. The necessities of State require it to be treated as a finality. And the history of the last ten years, with its present results, only shows us that even in governments with a written constitution, also a necessity, *ultimata* are also a State necessity. What constititional lawyer would have deduced from the nature of our government, and the provisions of our Constitution, the possibility of the history of the last twelve years; the coercion of States by Federal arms, the abolition of slavery by Federal power, and the establishment of the present governments in the so-called rebel States by Federal legislation. Yet nine-tenths of the American people are to-day accepting these results as finalities. And the Supreme Court of the United States have lately, by a solemn judgment, declared them *ultimata*—the work of the political department of the government, in its judgment upon an anomalous and exceptional state of public affairs, over which the judiciary has no jurisdiction. *Stare decisis* is an accepted and valuable rule for the regulation of Courts, even in ordinary matters, but when its application becomes necessary to prevent anarchy in the government itself, it is doubly important.

Let it then for the sake of the argument be admitted that the two Houses decided the question of their right to sit without a two-thirds vote of prolongation wrongly, it does not by any means follow that the laws passed at the subsequent sessions are void. The decision was by a tribunal compepetent to decide it, and having exclusive jurisdiction over the question, and if even this be not so the decision has, by the course of events, become so blended with the very organization of the State, that it stands as an *ultimatum*, not subject to inquiry. But there is a less abstract view of this subject which, as it seems to me, is equally conclusive. As I have said, the question made is not so much the constitutionality of the Act under review as the legality of the Legislature

that passed it.   By assuming jurisdiction over this question this Court assumes a power of control over the Legislative department of the government that, most certainly, it cannot exercise *directly*.   Very clearly, no writ of *quo warranto* or injunction would lie before any Court, either to test the legality of the Legislature, or the right of the Governor to perform the executive functions.   Were there two persons claiming to be Governor, perhaps the Courts might decide, not which was the rightful officer, but which was recognized as such by the General Assembly, and if there were two bodies, each claiming to be the Legislature, the Courts, whilst, during the contest, they must and would be powerless, might, after the contest was over, recognize that as the true one which was practically successful with the people.   But, by no direct action, can the Courts try the legality of the Legislature.   If they cannot do this directly, by a proceeding for the purpose, can they do so indirectly, by deciding upon the validity of the Acts it may pass, on the ground that the body *passing them was not a legal body?*   To set up the judiciary as an arbiter of the legality of the Legislature, a co-ordinate department of the government; to make it the oracle to which contending revolutionists shall come for judgment as to who is right, is to enthrone it as the supreme power in the State, and to confer upon it a jurisdiction dangerous to its own existence, and never contemplated by the fundamental law.   To decide when a law conforms to the Constitution is one thing, to decide, who are the law makers is another.   To do the one, the people have expressly granted to the Courts; to do the other, there is not only no grant, but the claim of such a right is a claim foreign to the nature of the judicial office, dangerous to the independence of the legislative and executive departments, and contrary to the first principles of a government of the people.

Necessarily, the Courts must decide what is the law—what is the legal will of the *law-making* power.   But if they have the right to go behind this, and to inquire whether the law-

making power is itself legal, they become, in effect, the supreme power in the State. A case may be supposed of a body—a mere public meeting—undertaking to pass laws, and it is asked if the Courts, when the acts of such a body are pleaded as law, must not inquire into the rightfulness of the claim of the body to be a law-making power. In such a case, the inquiry by the Courts would be, not the rightfulness of the authority; not its conformity to any written code of constitutional law, but whether it was in *fact* the legislative department of the government, recognized as, such, by the people, or by whatever final arbiter has power to enforce its edicts. In other words, Courts do not make governments, or decide upon their validity. If they cannot recognize as rightful, the law-making power, which is, in fact, supreme, they must get out of the way, and not attempt, by their feeble arm, to stay the tide of revolution. Luther *vs.* Borden, 7 Howard, 1.

But there is another ground, which, though it assumes the right of the Courts to pass upon the legality of the Legislature directly, is fatal to the position taken against this law. It is a settled rule, that even where Courts have power to inquire into the right of an officer to perform official acts, they will not do so collaterally. They will freely investigate the legality of any particular act, but they will never, in so doing, inquire into the right of the officer to act, as such, at all. The rule is uniform, that the acts of an officer, otherwise legal, cannot be attacked on the ground of any illegality in his appointment, or on the ground that though he is an officer in fact, he is not so according to law.

Is not the General Assembly, actually in session, entitled from the Courts to at least the same measure of consideration as they grant to a constable or a Justice of the Peace? Will the Courts, in inquiring into the validity of the acts of even such humble officers as these refuse to declare them illegal, because of a defect in the legal title of the officer to his position, and yet determine an Act of the Legislature invalid

because of a defect in its title to perform legislative functions? There is one thought more which occurs to me as a conclusive reply to the claim of *this Court's* jurisdiction over this question. As I have said, it so happens that the regularity and legality of the whole of the legislative, executive and judicial departments of the government, as they at present exist, depend upon the validity of the Acts of the session of 1870 after the forty days. I have, as I think, clearly shown that those Acts are valid, and that the government, as it now exists, stands upon impregnable ground in any view of the case the Court is authorized to take. But assuming the contrary—assuming that the Acts of the session of 1870 were void, because the Legislature was sitting at a time prohibited by the Constitution, precisely the same objection lies to the legality of this Court. It is also sitting at a time not authorized by law, if those Acts be void. It is held, also, by men appointed and confirmed by a Governor and a Senate, elected and meeting at a time not authorized by the Constitution, and in the very same breath with which it should declare the Acts of the session of 1870 invalid and void, it would declare itself illegal. It would, upon the very same principles, be no Court, and be thus without power to pass authoritatively upon the question.

For these reasons I am of the opinion, that the Acts of the session of 1870 are not void, even though the Legislature may have decided wrongly, when it declared the session of that year not to need a two-thirds vote of prolongation; that the rules of law, the nature of the question, and the necessary balance of power among the different departments of the government, deprive the Courts of jurisdiction over the subject. If these principles be correct, it is wholly immaterial for the purposes of this case, whether the session of 1870 was a session after the second or not. That it was the intent of the framers of the Constitution to allow two sessions after the Constitution should go into operation, as the supreme law, independent of military interference, seems unquestionable ;

The Macon and Augusta Railroad Company *vs.* Little.

and it is an undoubted fact that the session held after July, 1870, was not the third session after this military interference ceased. It would seem to follow, almost inevitably, that the session of 1870 did not need to be prolonged by a two-thirds vote. My brother Montgomery puts his judgment mainly upon this ground, not that he doubts the soundness of the positions I have taken, but because he is thoroughly satisfied of the soundness of that view of the case, and the great pressure of labor on this Court renders it inconvenient for both of us to discuss the whole subject. I may make the same remark for myself. I am satisfied with my brother Montgomery's view of the matter. But I prefer to put my judgment, in the view I have taken, leaving the discussion of the other view to his discretion.

WARNER, Chief Justice, dissenting.

This was an action brought by the plaintiff against the defendant on the contract of his testator as a subscriber for fifteen shares of the capital stock of the Macon and Augusta Railroad Company, to recover the amount due for his unpaid stock. On the trial, the defendant made a motion to dismiss the plaintiff's action, on the ground that it was a debt existing prior to the 1st of June, 1865, and that no affidavit had been filed, that all legal taxes due thereon had been paid as equired by the Act of 13th October, 1870. The Court dismissed the plaintiff's action, to which ruling of the Court the plaintiffs excepted. The Act of 13th of October, 1870, so far as it applied to the plaintiff's debt, is in violation of the 10th section of the first Article of the Constitution of the United States, and is therefore void. See concurring opinion in Scott, guardian, *vs.* Dysart & Vinson, decided at the present term. That Act is also void, as having been passed in violation of the express provisions of the Constitution of the State of Georgia. The Constitution of 1868 declares that, "No session of the General Assembly, after the second under this Constitution, shall continue longer than forty days,

unless prolonged by a vote of two-thirds of each branch thereof." This Act was passed at the *third session* of the General Assembly under the Constitution of 1868, more than forty days after the commencement of the third session, which was not prolonged by a vote of two-thirds of each branch thereof, and is therefore null and void as *a law of this State*. My reasons for this judgment were fully expressed in my dissenting opinion in the case of Gormley, Ordinary, *vs.* Taylor, (not yet reported) and will not be again repeated. All legislative enactments, which are to be binding upon the people, as *laws*, must be enacted in pursuance of the requirements of their Constitution, and if not, whenever they interfere with the rights of the citizen, such citizen may appeal to the Courts and have them declared void; for the Constitution of 1868 expressly declares that, "legislative Acts, in violation of this Constitution or the Constitution of the United States, are void, and the judiciary shall so declare them." If the Courts may inquire into the validity of legislative Acts passed by the General Assembly when sitting *within* the time prescribed by the Constitution, much more may they inquire into the validity of pretended legislative Acts which were passed at a time *prohibited* by the Constitution, because there is no legal presumption in favor of the validity of legislative enactments passed at a time expressly prohibited by the Constitution, although they may have the form and color of laws upon the face thereof, the more especially when it is apparent that such *pretended laws* were intended to deprive the *honest* people of the State of their legal and just rights to their property.

We may have a *corrupt* Executive, we may have a *venal* Legislature, (and such a state of things is not impossible,) still, if we have an honest, independent judiciary, the rights and liberties of the people may be protected; but if we have a mere *time-serving* judiciary, which will indorse and sanction the *usurpations* of the other two departments of the government, then the people will have no protection for

either their persons or their property. The position assumed by the majority of the Court in this case, as I understand it, is that the session of the General Assembly of the State of Georgia, held in 1870, was not a session after the second, under the Constitution of 1868, but that the sessions of the General Assembly of the people of this State, held in 1868, 1869 and 1870, were held under the Reconstruction Acts of Congress, and, therefore, that clause of the Constitution of 1868 which prohibits *any session* of the General Assembly after the second, under that Constitution, from continuing longer than forty days, unless prolonged by a two-thirds vote of each branch thereof, has no application to those sessions of the General Assembly which were held in the years 1868, 1869 and in 1870. This position, in view of the plain facts of the case, is totally incomprehensible to my mind, and can only be accounted for on the principle of the old adage, that "when a fox is closely pursued he will run into almost any hole." The Constitution of 1868 was *accepted by Congress* as the organic law of the people of this State prior to the 21st July, 1868, in accordance with the provisions of the Reconstruction Acts, and that Constitution, so accepted by Congress, has never been interfered with as *the organic law of the State, by Congress.* It is true, that in December, 1869, Congress passed an Act to reorganize the General Assembly held under that Constitution, in accordance with their declared views of it, and it is also true that the General Assembly was *purged* by military authority, in violation of the provisions of that Act; but no Act of Congress has interfered with the provisions of the Constitution of 1868 since its *acceptance* by that body.

The General Assembly of the State of Georgia was created by the Constitution thereof, and owes its *existence* to that organic law of the State, and no *session* of the General Assembly of the people of Georgia, provisional or otherwise, could be held under any law except that which created it, and provided for its organization and election of its members·

Every session of the General Assembly of the people of Georgia, whether provisional or otherwise, must, *necessarily*, have been held under that Constitution which created it, and provided for its organization. If, since the acceptance of the Constitution of 1868 by Congress, under the Reconstruction Acts, there has been any unconstitutional interference by Congress or the military 'authorities of the United States, with the *sessions* of the General Assembly of the people of Georgia under that Constitution, such interference does not make the sessions held under it any the less *sessions of the General Assembly held under that Constitution.* The published journals of the General Assembly show that the *first session* of the General Assembly, under the Constitution of 1868, commenced in July, 1868, and adjourned *sine die* on the 6th day of October, 1868. The *second session* of the General Assembly under that Constitution commenced on the 13th day of January, 1869, and adjourned *sine die* on the 18th day of March, 1869. The *third session* of the General Assembly under that Constitution commenced on the 10th day of January, 1870, and was adjourned by proclamation of the Governor on the 25th day of October, 1870. The Act in question, now before the Court, was passed on the 13th day of October, 1870.

If the sessions of the General Assembly of the people of Georgia, held in 1868, 1869 and in 1870, were not held under the Constitution of 1868, under what Constitution, or under what law, organic or otherwise, was that body created and organized as the General Assembly of the people of the State of Georgia,'and authorized to hold a session thereof?

The confessor of Ferdinand of Styria, the Jesuit, once said of him, that such was his *devotion* to his religious creed, that if a priest and an angel had met Ferdinand, that he would have made his obeisance to the representative of Rome, before he noticed the heavenly visitor. The majority of the Court, in order to sustain their judgment in this case, exhibit a wonderful *alacrity* to make their *obeisance* to the Reconstruction Acts of Congress, without *noticing the*

*Constitution of the State*, under which they hold their office, and which they are sworn to support, when there is nothing in those Acts which requires them to do so, in regard to the question now before the Court. But there is another difficulty in the way of the judgment of a majority of the Court, which, to most legal minds, would seem to be insurmountable. In *Foster vs. Daniels*, 39 Georgia Reports, 39, this Court *unanimously* held and decided that the Constitution of 1868 took effect and went into practical operation, on the 21st day of July, 1868. There is nothing in any of the Reconstruction Acts of Congress that interferes with or pretends to interfere with the principles settled by the unanimous decision of this Court in that case, in regard to the time when the Constitution of 1868 took effect and went into practical operation, and that is really the only question in the case now before the Court. The 204th section of the Code declares that "A decision, concurred in by three Judges, cannot be reversed, or materially changed, except by a full bench." This has not been done ; and the majority of the Court, as well as the minority, were bound by it, unless they have the legal power to *dispense* with the stern provisions of the law.

If the Constitution of 1868, *as accepted by Congress*, took effect and went into practical operation under the Reconstruction Acts, on the 21st day of July, 1868, as this Court *unanimously* decided, then there is an end of the question, whether the sessions of the General Assembly of the people of Georgia, held subsequent to that date, were held under that Constitution, for they could not have been held under any other law except that which created that legislative body, and provided for its organization. I, therefore, dissent from the judgment of the Court in this case, and in the case of *Johnson, administrator, vs. Sayre et al.*