### EPPING *v.* CITY OF COLUMBUS *et al.*
### ROFF *v.* MAYOR AND ALDERMEN OF CALHOUN.

1. In interpreting the provisions of a constitution, it is to be presumed that
the words therein used were employed in their natural and ordinary mean-
ing ; and where a word has a technical as well as a popular meaning, the
courts will generally accord to it its popular signification, unless the nature
of the subject indicates, or the context suggests, that it is used in a technical
sense.

2. Constitutions are the result of popular will, and their words are to be un-
derstood ordinarily in the sense they convey to the popular mind.

3. The presumption is that the same meaning attaches to a given word or
phrase wherever it occurs in a constitution ; and where a word or phrase is
used in one part of a constitution in a plain and manifest sense, it is to re-
ceive the same interpretation when used in every other part, unless it clearly
appears, from the context or otherwise, that a different meaning should be
applied to it.

117   263
Case 1
120   293

117   263
Case 1
e122  458

117   263
Case 2
f119  886

117   263
Case 2
e122  302

117   263
Case 2
124   67

117   263
Case 2
f127  224

117   263
Case 2
f129  630

4. The proceedings and debates of a constitutional convention, while power-less to vary the terms of the constitution, are nevertheless valuable aids in determining the purpose and consequent meaning of a doubtful provision.

5. The debt of an individual, corporation, State, etc., when the word is taken in the sense that it ordinarily conveys to the popular mind, is the principal and accrued interest on a given date.    Unearned interest is not, in such a. sense, a part of the debt.

6. The debt of a municipal corporation, within the meaning of that provision of the constitution which prohibits such a corporation from incurring a debt which exceeds seven per centum of the assessed valuation of all the taxable property within the municipality, is to be ascertained by adding to the prin-cipal of all outstanding indebtedness the amount of all accrued interest that. may be past due and payable on the day the amount of the debt is to be fixed. In ascertaining the amount of such debt, future interest which is not due on the day it becomes necessary to fix the sum of indebtedness is not to be counted.    Unearned interest is not, within the true intent and meaning of the constitution, a part of the debt of the municipality.

7. A long-continued and unquestioned interpretation of a paragraph of the constitution by the General Assembly, or the Executive, or the officers whose duty it is to obey and carry into effect the provisions of the paragraph, is a weighty argument in favor of such interpretation ; especially where any language of the paragraph is equivocal, doubtful, or ambiguous.

8. The ruling made in the present case does not conflict with that made by the majority of the court in *Park* v. *Candler*, 114 *Ga.* 466, nor with the views. entertained by the dissenting Justices in that case.    The question there in-volved was whether the public-property fund could lawfully be appropriated to the payment of accrued interest, when at the time of such payment no part. of the principal of the public debt was extinguished ; the majority of the court, holding that accrued interest could be discharged in this manner without ref-erence to whether any part of the principal was paid off at the same time, while the minority were of opinion that the public-property fund could not be used for the payment of accrued interest, except as a mere incident to the retirement of a part of the principal.

9. The *Dawson Waterworks* case, 106 *Ga.* 696, did not involve the question as. to whether interest, either accrued or unearned, was a part of the debt of the municipal corporation, within the meaning of the provision of the constitu-tion above referred to.    The contract sought to be enforced in that case re-lated to a principal liability payable in annual installments ; and this was held to be a debt within the meaning of the constitution.

10. If a final judgment of a court from which a writ of error lies is, from a de-fect appearing on the face of the record, erroneous, this defect may be taken advantage of in a direct bill of exceptions containing a specific assignment. of error setting forth the defect, even though no such objection was raised in the court below prior to the rendition of the judgment.

11. A provision by a municipal corporation for the assessment and collection of an annual tax sufficient in amount to pay the principal and interest of a bonded debt within the time prescribed by the constitution is a sufficient com-pliance with the constitution, although the ordinance making the provision provides that the interest and a portion of the principal may be from year to year paid from other sources, if funds from such sources are available at the time the interest and principal are due.

12. The constitution does not require that provision shall be made by a municipal corporation, desiring to incur a debt, for the payment of such debt, until "at or before" the liability is created. It is not necessary that the provision for payment should be made before the application to validate. If on the hearing of such an application nothing appears to the contrary, the presumption is that provision will be made at the time and in the manner prescribed by the constitution. If, however, it does distinctly appear that the municipal corporation does not intend to make such provision, a judgment of validation should not be entered. In the case of *Wilkins* v. *Waynesboro*, 116 *Ga.* 359, it distinctly appeared 'that the city authorities did not in any event intend to make provision for the payment of the debt in the manner prescribed by the constitution.

13. When the charter of a town provides that the books for registration of voters for an election shall be closed ten days before the election, and the ordinance following the charter makes the same provision, a published notice of an election, which is capable of a construction that the books will be closed earlier than ten days, will not have the effect of invalidating an election held in pursuance thereto, when it does not appear that the books were in fact illegally closed and that persons qualified to vote were for this reason prevented from registering.

14. When the charter of a town authorizes the town authorities " to provide for the registration of voters " and " to make all needful laws and regulations for the same," an ordinance providing that two members of the town council shall be registrars, whose duty it shall be to ascertain who are the qualified voters of the town and entitled to register, and that in case of disagreement between such registrars in reference to whether any person offering to register is a qualified voter they may call in a citizen of the town to act as umpire, whose decision shall be final, is a reasonable regulation and one authorized by the provisions of the charter.

15. When in an application for the validation of an issue of bonds a citizen appears and is made a party to the proceeding, and interposes objections to the validation, based upon facts which do not appear in the pleadings of the parties, it is incumbent upon him to establish by proof the facts thus set up ; and unless this is done, the objections should be overruled.

16. A ground of objection to the validation of an issue of bonds, that a specified number of voters who had voted in favor of the issuance of bonds were not qualified voters, is properly stricken on demurrer, when it does not appear that, with this number eliminated, two thirds of the qualified voters had not voted in favor of the issuance.

17. An election held to determine the question whether a town will incur an indebtedness will not be invalidated by reason of the fact that voters were improperly influenced to cast their votes in favor of incurring the debt; certainly not when it does not appear that any voter was actually coerced to cast a vote contrary to his wishes.

18. The fact that the authorities of a municipal corporation have entered into a contract to sell bonds which it is seeking to have validated, at a sum which is less than the bonds are really worth, is no reason for refusing to enter a judgment validating the issue of bonds.

Calhoun case argued October 20, 1902, and reargued January 20, 1903.

Columbus case argued February 18, 1903. Decision March 12, 1903.

Validation of bonds.    Before Judge Gober.    Gordon superior court.    June 26, 1902.    Before Judge Butt.  Muscogee superior court.    December 30, 1902.

*Harkins & Lang* and *R. J. & J. McCamy,* for Roff.

*W. R. Rankin* and *S. P. Maddox, solicitor-general,* for Calhoun.

*Louis F. Garrard* and *Little & Battle,* for Epping.

*T. T. Miller* and *S. P. Gilbert, solicitor-general,* for Columbus.

Briefs for validation were filed by *J. L. Mayson, W. P. Hill, W. W. Lambdin, S. H. Myers,* and *C. J. Swift.*

Brief of *Salem Dutcher,* contra.

COBB, J.   1-7.   Each of these cases involves questions arising upon an application to validate an issue of bonds by a municipal corporation.   In the first case, which will be hereafter referred to as the Columbus case, the City of Columbus seeks to have validated an issue of bonds for $250,000 principal, the proceeds to be used for the purpose of erecting a system of waterworks.   In the second case, which will be hereafter called the Calhoun case, the town of Calhoun seeks to have validated an issue of bonds for $5,000, the proceeds to be used for the purpose of erecting and equipping a schoolhouse.   There is one question which is common to both cases, and that will be first disposed of.   The constitution declares : "The debt hereafter incurred by any county, municipal corporation, or political division of this State, except as in this constitution provided for, shall not exceed seven per centum of the assessed value of all the taxable property therein, and no such county, municipality, or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one fifth of one per centum of the assessed value of taxable property therein, without the assent of two thirds of the qualified voters thereof, at an election for that purpose, to be held as may be prescribed by law; but any city, the debt of which does not exceed seven per centum of the assessed value of the taxable property at the time of the adoption of this constitution, may be authorized by law to increase, at any time, the amount of said debt, three per centum upon such assessed valuation."   Civil Code, § 5893.   The question to be determined is, what is the meaning of the word "debt," as used in this paragraph of the constitution ?   Does it mean principal only, or principal and accrued interest, or principal

and all interest that is to accrue between the date of the incurring of the debt and the date the principal matures? It will be noted that the word "debt" occurs four times in the paragraph; and whatever meaning is to be given it in one place must necessarily be given to it in the others. In the first two places the word is used in reference to future liabilities that may be incurred by counties and municipal corporations. In the last two the word is used to designate the existing liabilities of certain cities of this State at the date of the adoption of the constitution. If this paragraph of the constitution is to be considered isolated and alone, what meaning is to be given to the word "debt"? The word is to be taken in its ordinary, natural, common sense, popular meaning, unless the context requires that it should be treated as used in a technical sense.

Constitutions are the result of popular will, and their words are to be understood ordinarily as used in the sense that such words convey to the popular mind. 6 Am. & Eng. Enc. L. (2d ed.) 924–5. There is nothing in the paragraph under consideration which indicates that the term "debt" was used in any other way than in its ordinary and popular sense. If a person unversed in the technical niceties of the law is asked what is the amount of his debts, his answer to the question in every instance would be an amount which would represent the present liability that he is under at the moment the question is answered. A farmer who had been so unfortunate as to be compelled to place a long loan upon his farm, if asked what was the amount of the debt upon his farm, would unhesitatingly answer by giving an amount which would represent the principal of the debt and any interest that was past due and payable at the time the inquiry was made. One who, in making a return of his property for taxation, is required to state to the tax-receiver the amount of solvent debts due him would not, in the case of a perfectly solvent debt, consider that he was under a moral obligation to return for taxation the value of the debt at any higher amount than one which would represent the principal and any interest that was past due at the time the return was made. It is useless to multiply illustrations. The debt of an individual, or a corporation, or the public, in its usual and popular sense, means the amount for which the individual or corporation or the public would be presently liable if called upon to discharge

the obligation. The law deals at all points with the man of ordinary prudence and average capacity as the standard, for the simple reason that communities and commonwealths are made up of persons of this class. Constitutions are adopted by commonwealths so made up, and the meaning to be given to such instruments is that meaning which the man of ordinary prudence and average intelligence and information would give. Generally the meaning given to words by the learned and technical is not to be given to words appearing in a constitution. In other words, the popular meaning is to be given to the words of a constitution, unless the context or the instrument taken as a whole imperatively requires some other meaning. Before the words can be given a purely technical meaning which would be different from the popular meaning, the intention that they should be so understood must be plainly apparent and palpably manifest. It may be conceded that the terms, "debt," "bonded debt," "mortgage debt," "floating debt," and all similar phrases include, in a technical and strictly legal sense, both the principal and interest of the debt; but when such terms are taken in their usual and popular sense, they never refer to anything but the principal of the debt, or, at most, the principal and any interest that may be past due at the time it becomes necessary to state the amount of the indebtedness. If this paragraph of the constitution be taken alone, we think that the word "debt" should be properly construed to include only the principal and any interest that might be past due at the time the debt of the city or county is to be ascertained.

This view is strengthened when we consider the paragraph of the constitution above referred to in the light of that paragraph which provides that "the bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war." Civil Code, § 5899. According to a well-settled rule of construction, when a word or phrase is used in one part of the constitution in a plain and manifest sense, it is to receive the same construction when used in another part, unless it manifestly appears from the clause in which it is used, or otherwise, that a different meaning should be applied to it. It is manifest that the framers of the constitution did not intend that the word "debt" in the paragraph just quoted should include interest on the bonded debt which was not due at the time the constitution

was adopted. If the word "debt" in the paragraph just quoted is to be construed as meaning both principal and interest, then the paragraph would read as follows: The principal and interest of the bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war. As the framers of the constitution were speaking of debt as it existed at the date the constitution was adopted, it is manifest that interest to become due in the future was not intended to be included. Any other construction would make the provision absurd and unreasonable. It can not, therefore, be adopted. The constitution provides that a debt may be created by the State "to supply casual deficiencies of revenue," but that such debt shall not exceed in the aggregate $200,000. Civil Code, § 5888. No one will contend that the limit of the debt thus to be created had reference to interest which was to mature between the date of the incurring of the debt and its maturity. It is manifest that the State has a right to borrow the full amount of $200,000 for the purpose indicated, and, in addition to this, to contract to pay interest thereon during the continuance of the obligation. In every paragraph other than that relating to the incurring of indebtedness by counties and municipalities, whenever the term "debt" is used, whether it refers to the debt of the State or the debt of the subordinate public corporations, whether it be bonded debt, public debt, or simply debt, it is plainly manifest that the term "debt" is used to refer to the principal of the debt due, exclusive of unearned interest on the same. See Civil Code, §§ 5882, 5900, 5901.

In only three instances is the word "interest" used in connection with the subject of the public debt. It is provided that when any county or municipality shall incur any "bonded indebtedness" it shall, at or before the time of so doing, provide for the assessment and collection of an annual tax sufficient in amount to pay the "principal and interest" of such debt within thirty years from the date of the incurring of the indebtedness. Civil Code, § 5894. This paragraph deals with the matter of the payment of the debt at the time of its maturity. It is not referring to the matter of interest to be earned in the future, but it is a provision that when the debt matures, when the principal is due and the interest is earned, there shall be provision made for the payment of the matured principal and earned interest. The word " of," preceding the

phrase " said debt," is to be construed as having the same meaning as " on," and provision is required to be made for the payment of the principal, that is the debt, and interest on the debt, that is on the principal; just as in the constitution it is provided that the General Assembly shall have power to levy a tax " to pay the interest on the public debt; to pay the principal of the public debt." Civil Code, § 5882. Another instance in which the word "interest" is used in the constitution in connection with the public debt is in the Civil Code, § 5898, which prohibits the payment, either in whole or in part, "of the principal or interest of the bonds, or other obligations, which have been pronounced illegal, null and void," by the constitution. It is to be noted that the word "interest," as used in this paragraph of the constitution, relates to bonds and other obligations; and it was therefore perfectly natural that the prohibition against the payment of the bonds should in terms be made applicable, not only to the principal, but the interest; that is, the whole transaction evidenced by the bonds and their coupons was declared invalid, and no part of the principal existing at that time due and unpaid, and no interest that might fall due in the future, was, under any circumstances, ever to be recognized as a liability against the State.

While the proceedings and debates of a constitutional convention can not be resorted to to alter or modify any constitutional provision, the meaning of which is perfectly clear, they may be looked to as valuable aids in determining the purpose and meaning of a term used in the constitution which is equivocal or ambiguous. Where the term used is one that has a well-defined popular meaning, the fact that the proceedings and debates of the convention indicate that it was the intention of the members of the convention that this term was to be taken in this sense, or the fact that nothing appears in the debates of the convention which would indicate that it was to be taken in any other sense, may well be considered by the courts as confirming an interpretation which gives to such word its usual and popular meaning. There is nothing in the journal or debates of the convention which indicates that the question as to whether the word " debt," in the paragraph of the constitution now under consideration, should include unearned interest was ever raised or discussed. While there was a discussion in reference to this paragraph, nothing at all appears in reference

to this subject. Neither does this question appear to have been raised in the discussion of any other paragraph relating to the public debt and interest thereon. See Small's Debates, 306 et seq.; Jour. Const. Con. 1877, p. 313 et seq. It not appearing that the framers of the constitution intended that the term "debt" should be used in any other than its ordinary and popular sense, it will be presumed that it was their intention that it should be taken in this sense, and that when the constitution was adopted the people understood that the word was used in its popular sense. Taking the word in this sense, it means the amount of present liability on a given date. The amount of one's indebtedness to-day is the principal sum which may be legally collected from him at a future time, plus any interest on the same which may have accrued up to to-day. Within the meaning of the constitution, the debt of a city at the time of the adoption of that instrument was an amount represented by the principal and the past-due interest at that time. In order, therefore, to determine at any time whether a city has incurred a debt exceeding seven per centum of the assessed value of the taxable property, it is necessary to ascertain only what is the principal amount of all the liabilities of the city and what is the amount of interest on such principal which is past due and unpaid at the time it becomes necessary to ascertain the amount of the city's indebtedness. A city's debt on a given date is the principal amount of all of its obligations, plus the past-due and unpaid interest on that date. It may be technically accurate to say that the word "debt" means more than this, and includes, not only past-due interest, but unearned interest as well; but in the paragraph of the constitution now under consideration we find the word "debt" is used simply in the sense of a present liability on the day that the amount of the debt is to be ascertained, and does not include an amount which might in the future increase the liability.

Similar questions have arisen in other States, under constitutions and legislative enactments, and the courts in construing such provisions have reached conclusions similar to the one we have reached. See Durant v. Iowa Co., 1 Woolw. 69, Fed. Cas. No. 4,189; Finnlayson v. Vaughn, 54 Minn. 331, 56 N. W. 49; Gibbons v. R. Co., 36 Ala. 410; Jones v. Hurlburt, 13 Neb. 125; Kelly v. Cole, 63 Kan. 385, 65 Pac. 672; Ashland v. Culberson, 103 Ky. 161, 44 S. W. 441; Herman v. Oconto, 110 Wis. 660.

See also Hanier's Mod. L. Mun. Soc. § 61; Simonton's Mun. Bonds, § 57, p. 65.    The only case to which our attention has been called which even apparently holds to the contrary is that of Coulson v. Portland, Fed. Cas. No. 3,275, a decision by United States District Judge Deady.    Upon an examination of the facts of that case it will be found that the transaction then under investigation was merely a scheme devised to impose upon the City of Portland a debt payable in annual installments, the aggregate amount of which would be far in excess of the amount fixed in the charter of the city as the limit of its indebtedness.

There is another consideration which throws light upon the construction to be given to the word "debt" in the paragraph of the constitution involved in the present case.    At the time the question was first raised as to the meaning of the word "debt" in this paragraph, the constitution had been in force for more than a quarter of a century.    During all that time the word had been construed to mean principal, and at most principal and accrued interest, by every public officer of the State, whether of the legislative or the executive department, or one of the subordinate public corporations of the State; and we think it can be safely asserted that this word in this connection was so construed by nearly all of the people of the State.    This would seem to be indicated by long acquiescence in the construction given by the other departments of the government and by the officers of the various cities and counties of the State.    Laws have been passed by the General Assembly from time to time during this entire period, authorizing cities and counties to issue bonds in such amounts as that the issue would be unlawful if unearned interest upon the then-existing indebtedness of the city or county was to be counted as a part of the debt.    If the meaning of the word is doubtful or ambiguous, this long-continued and unquestioned construction placed upon the word by the legislative and executive departments of the government is a weighty argument in favor of giving to the word the meaning thus given it.    There are decisions of many courts holding that the plain import of a constitutional provision may be disregarded in order to avoid the injurious consequences of overturning long-established, though erroneous, practical construction.    See cases cited in 6 Am. & Eng. Enc. L. (2d ed.) 932-3.    But we do not at this time propose to commit ourselves to the soundness of this proposition.

It is, however, well settled that in determining the meaning of words in a constitution which are doubtful, ambiguous, or equivocal, the long-continued practice of co-ordinate departments of the government may well be resorted to by the judicial department as an aid in determining what is the true meaning of words contained in the instrument. See the authority just above cited. In *Solomon* v. *Commissioners*, 41 *Ga.* 161, Judge Warner, in referring to the power of the Governor to approve bills after the adjournment of the legislature, uses this language: "If this was an original question, independent of any construction heretofore given by the executive department of the State government to this clause of the constitution, we should be inclined to hold that the Governor could not approve and sign any bill after the adjournment of the General Assembly; but on looking into the past history of our legislation, we find that it has been the practice for many years for the Governor to take five days after the adjournment of the General Assembly for the revision of bills passed by that body, and to approve and sign the same within that time, but not afterwards, and that a large number of the most important acts now upon the statute books of the State have been so approved and signed, which usage and practice of the executive department of the State government should not now, in our judgment, be disturbed or set aside." See also *Macon Railroad Co.* v. *Little*, 45 *Ga.* 379; *Miller* v. *Wilson*, 60 *Ga.* 507; *Pulaski County* v. *Thompson*, 83 *Ga.* 274; *Fullington* v. *Williams*, 98 *Ga.* 813. During the past quarter of a century some of the ablest lawyers of the State have been from time to time members of the General Assembly, and there have been in the General Assembly lawyers of eminent ability who were also members of the constitutional convention of 1877. It is also a matter well known that many of the legal advisers of the cities and counties of the State during that period of time have been among the ablest members of the profession. The unanimous views of all of these public officials is itself a matter to which the court can with propriety pay some respect in determining the true interpretation of a constitutional provision when its words are equivocal or ambiguous. We do not reach the conclusion stated in this case by listening to the argument ab inconvenienti. A strong and forcible argument might be made on this line, even if it could be shown that the interpretation now placed upon the constitution was at

the beginning an erroneous one. But the ruling now made is based upon the proposition that the paragraph of the constitution under consideration, properly interpreted, does not require that unearned interest shall be counted in estimating the debt of a municipal corporation. We are somewhat confirmed in this view when we look about us and see that the same conclusion has been reached by all public officers whose duty it has been to determine this question during the entire period of time the constitution has been of force. If the interpretation now sought to be placed upon the constitution by the plaintiffs in error is the true one, strange indeed it is that no public officer has so construed it, and no licensed attorney in the State ever saw fit to raise the question during a period of more than twenty-five years, when there have been so many occasions, not only when the question could have been raised, but when it ought to have been raised, if there was any merit in the contention.

8. There is nothing in the view above presented which is at all in conflict with that entertained, either by the majority or the minority of the court, in the case of *Park* v. *Candler*, 114 *Ga.* 466. That case was dealing with the subject of accrued interest, and the question there was whether the public-property fund could be lawfully appropriated to the payment of accrued interest on the public debt. The majority of the court were of opinion that this fund could be so appropriated without reference to whether any part of the principal was at the same time discharged; while the minority entertained the view that, under the financial scheme of the constitution, the fund could not be used for this purpose except as a mere incident to the payment of a part of the principal debt. The language of both opinions must be taken in the light of the fact that only accrued interest was involved in that case.

9. There is nothing in the ruling now made to conflict with that made in the *Dawson Waterworks* case, 106 *Ga.* 696. There was no question of interest involved in that case. The City of Dawson undertook to make a contract with the waterworks company, by which it agreed to pay the company during a term of years a stated sum annually for the use of water. This was an undertaking on the part of the city to pay an indebtedness, the amount of which was represented by the aggregate sum which would be due during the period the contract was to continue.

This was the debt, and the principal of the debt, and under the contract it was divided up into annual installments.    It was then held that this was a debt within the meaning of the constitution, and that the City of Dawson had no right to incur the same without submitting the contract to the popular vote.    In some of the cases above cited from other jurisdictions, holding that unearned interest is not a part of the debt within the meaning of provisions similar to those in our constitution, it is said that the same reasoning employed to sustain the rulings there made would likewise sustain the position that such contracts as that involved in the *Dawson Waterworks* case did not create a debt within the meaning of such constitutional provisions.    This view is simply the reasoning of the judges in the different cases, and is not, we think, the only reason which can be set forth to establish the proposition that unearned interest in such cases is not a part of the debt.    While we may follow the rulings made in the different cases, we do not mean to say that the reasoning in each case is entirely satisfactory to our minds.    Contracts of the character involved in the *Dawson Waterworks* case involve the payment of principal, and therefore create debts within the meaning of the constitutional provision under consideration in this case.    A city can not incur a debt of any character the principal of which is to be paid in the future, without incurring a liability for interest, either to be paid before the principal is due or at the time it matures. A liability for interest inevitably comes when the principal matures, and, with but few exceptions, by special undertaking between the parties.    This liability is simply incidental to the liability for the principal.

It may be said that it is practically impossible for a city to become indebted in any amount, without incurring at least a contingent liability for interest on the principal sum borrowed.    The constitution recognizes the right of a city to incur a principal debt, and under this authority it has necessarily a right to incur a contingent liability resulting from the accumulation of interest upon the principal.    But a contingent liability for interest will not make the amount of interest which may be due upon the happening of the contingency a part of the debt of the city, within the meaning of the constitution.    Principal, whether due or to become due in the future, is a part of the debt of a municipality, within the

meaning of the constitution.     Interest is to be regarded as incidental to the debt ; principal is always debt, and *the* debt.  " What is interest ?    It is an accessary or incident to the principal.    The principal is a fixed sum, the accessary is a constantly accruing one. The former is the basis or substance · from which the latter arises and on which it rests. "     Howe *v.* Bradley, 19 Me. 36.    Interest on the principal debt is not, within the meaning of the constitution, a part of the debt until it is due.     We believe we have demonstrated this to be true.     If so, there is no conflict between the ruling now made and that in the *Dawson Waterworks* case.   What was agreed to be paid in that case was principal, and not interest.    It was a principal debt and a principal liability from the very moment the contract was entered into.    The liability from year to year for the amount of each installment was not an incident to any other liability in the way that interest is an incident to the payment of principal.     In ascertaining the debt of a city, principal, no matter for what purpose it may have been incurred, is to be counted as a part of the debt. Unearned interest is not to be counted. Municipal authorities will not be allowed to baffle the constitutional provision by a cunningly devised scheme calling that interest which is really principal.    The courts will look at the substance, and if the undertaking of the city really increases the principal of the city's indebtedness, no matter what such indebtedness may be called — interest, current expenses, or otherwise, — the scheme will not be allowed to prevail, when the hands of the municipal authorities are sought to be tied by an obligation to pay what is in reality a principal debt.     When this is kept fully in mind, the distinction between the present case and the *Dawson Waterworks* case will become apparent.     As an illustration of a very unique scheme devised for the purpose of increasing the principal liability under the name of interest, see the case of Coulson *v.* Portland, Fed. Cas. No. 3, 275.    The following decisions, which are not cited in the *Dawson Waterworks* case, sustain the view there taken by this court : Coulson *v.* Portland, supra ; Beard *v.* Hopkinsville, 95 Ky. 239, 44 Am. St. Rep. 222, 23 L. R. A. 402 ; Culberson *v.* City of Fulton, 127 Ill. 30 ; City of Springfield *v.* Edwards, 84 Ill. 626.

10–11. · The bill of exceptions in the Columbus case assigns error upon the judgment validating the issue of bonds, upon the ground that the notice of the election did not in terms notify the

qualified voters what amount would be annually collected for the purpose of paying the interest on the bonds, and that the scheme and plan of the municipal authorities as expressed in the notice did not contemplate that a sum sufficient to pay the interest on the bonds should be raised by the levy and collection of an annual tax, as required by the constitution. It appears from the bill of exceptions that this question was not raised before the trial judge. If a final judgment rendered in the superior court is an erroneous judgment, and the fact that it is erroneous appears upon the face of the record, this defect may be taken advantage of by a direct writ of error, containing a specific assignment of error · setting forth what the defect is, even though the question raised by the assignment of error was not made in the court below. See *Kelly* v. *Strouse*, 116 *Ga.* 872 (5); *Stephen* v. *State*, 11 *Ga.* 226 (4); *Governor* v. *Hicks*, 12 *Ga.* 189 (2). As the question sought to be raised by the assignment of error is properly before us, it remains to be considered whether the assignment is well founded. The ordinance providing for the calling of the election set forth that in the event the proposed issue of bonds was assented to by the qualified voters, and the issue was validated as by statute provided, " an annual tax shall be thereafter levied and collected by the mayor and board of aldermen of the City of Columbus, on the taxable property within said city, sufficient to pay the interest semi-annually as aforesaid on said issue of bonds, or so much thereof as may not be paid from the income to be derived from said waterworks, and for the payment of interest on such of said bonds as may not have been paid off for each and every year thereafter, and for the payment annually of ten thousand dollars of the principal of said bonds, or so much thereof as may not be paid from the income to be derived from said waterworks; so that the principal and interest of said bonds shall be paid off and extinguished at the respective dates of maturity as fixed in this ordinance." The notice of election contained the following: " Of the principal of said bonds, $10,000 is to mature and fall due annually, so that the whole amount shall be paid off in twenty-five years; and a fund is to be provided by the mayor and board of aldermen of said City of Columbus, each year from the date of said bonds to the maturity thereof, by annual taxation, sufficient for the redemption of said bonds at maturity, to wit: $10,000 each

year, and the payment of the annual interest on said bonds, or so much thereof as may not be paid from the income to be derived from said waterworks."

The constitution declares that municipal corporations shall not incur any debt until provision therefor shall have been made by the municipality; and that no municipal corporation shall incur any bonded indebtedness, unless, at or before the time of so doing, it provides for the assessment and collection of an annual tax sufficient in amount to pay the principal and interest of the debt within thirty years from the date of the incurring of the debt. Civil Code, §§ 5897, 5894. The constitution thus requires a municipal corporation to make provision for the payment of any debt it may incur by providing for the assessment and collection of an annual tax sufficient in amount to discharge the principal and interest of the debt. This does not, however, mean that the municipal authorities are compelled to collect this tax, if when the time arrives for payment of any part of the debt, either principal or interest, there are funds in the treasury derived from other sources which may be lawfully applied to the payment of the debt. The municipal authorities must make provision for the levy and collection of an annual tax, in the event the collection of the tax is necessary for the purpose of paying the debt; but we do not think it was the intention of the framers of the constitution that the municipal authorities should be compelled to collect the tax, although levied, when there were funds in the treasury derived from other sources which could be lawfully appropriated to the payment of the municipal indebtedness. The ordinances and notice of the election, properly construed, simply mean that a tax shall be levied each year sufficient in amount to pay the interest due during the year, and the part of the principal maturing during the year, and that the tax so levied shall be collected and appropriated for this purpose; provided that if there are other funds in the treasury derived from the income of the waterworks, which of course can, in the discretion of the municipal authorities, be applied in payment of the public debt of the city, the principal and interest may be discharged by the use of this fund, instead of requiring the taxpayers to pay the amount of the tax levied for this purpose. It is manifest, both from the ordinance and the notice of the election, that it is the purpose of the municipal authorities to comply with the

constitution, so far as making provision for the payment of the debt is concerned, and that it is their purpose to pay the debt by taxation, if necessary, according to constitutional methods; but the taxpayers are notified that the net income from the waterworks will be set apart for the payment of this debt, and if this is sufficient for the purpose, the collection of the tax levied, either in whole or in part, will be rendered unnecessary. This case is to be distinguished from the case of *Wilkins* v. *Waynesboro*, 116 *Ga.* 359, in that it was apparent in that case, from the notice, that the city authorities did not intend, in any event, to raise by taxation a sum sufficient to pay the principal and interest of the debt. We find no error requiring a reversal of the judgment in the Columbus case.

12. Having disposed of all questions raised in the record in the Columbus case, we will now consider the questions raised in the record in the Calhoun case which are not disposed of by the foregoing discussion, and all that follows will be applicable to that case alone. Roff, the intervenor, interposed numerous objections to the validation of the bonds, and these will now be disposed of. One of these objections was that the mayor and aldermen had not made provision for the payment of the bonds in the manner prescribed by the constitution. It was further stated in this ground that the mayor and aldermen had not even made provision for the payment of the principal of bonds which had already been issued by the town. The constitution requires that a municipal corporation which shall incur any bonded indebtedness under the provisions of the constitution shall, "at or before the time of so doing, provide for the assessment and collection of an annual tax sufficient in amount to pay the principal and interest of said debt within thirty years from the date of the incurring of said indebtedness." Civil Code, § 5894. Also, that municipal corporations shall not incur any debt until provision therefor shall have been made by the municipal government. Civil Code, § 5897. A municipal corporation can not lawfully issue bonds until the consent of the qualified voters has been obtained in the manner prescribed by law. The General Assembly has provided a method by which the courts shall determine whether the consent of the qualified voters has been obtained to the issuance of the bonds in the manner prescribed by law, and as to whether a debt may lawfully be incurred

by the municipality or county.    The act of 1897 (Acts 1897, p. 82, Van Epps' Code Supp. § 6074 et seq.) provides a method of ascertaining, before the bonds are issued and the debt incurred, whether the municipality or county can lawfully incur a debt of the amount sought to be incurred and for the purpose for which it is to be incurred, and whether the assent of the qualified voters has been obtained in the manner required by law.    A judgment of the superior court validating an issue of bonds concludes the municipality, its citizens, and every one else on all the questions above referred to, as well as on all other questions which the constitution and laws require to be determined before authority is granted to a municipality to incur a debt.    One who holds a bond stamped as validated in compliance with the provisions of the act of 1897 has a right to presume, not only that the municipality had authority to incur the debt for the purpose for which the bond was issued, but also for the amount represented by the bonds issued, as well as that the consent of the qualified voters had been obtained to the issue, in the manner prescribed by law.    The constitution requires that, before the debt is incurred, provision shall be made in the manner above indicated for the payment of the bonds within the time prescribed.    Neither the constitution nor any statute of this State requires that this provision shall be made before the election is held to determine whether the assent of the qualified voters shall be given.    It is simply required that this provision shall be made before the debt is incurred; and the debt is not incurred until the bonds are issued.

The question as to whether provision has been made is not necessarily involved when the application is made to validate the bonds under the act of 1897.    From the language of that act it will appear that it is not incumbent upon the court to inquire into the question as to whether the provision has been made in conformity with the requirements of the constitution.    The bonds are not to be issued until after they are validated.    The provision is not required to be made until at or before the issuance of the bonds; and therefore, in the proceeding to validate the bonds, if nothing appears as to what provision is to be made with reference to payment of the bonds, it will be presumed that if provision has not already been made it will be made in accordance with the constitution and laws.    See, in this connection, *Wimberly* v.

*Twiggs County,* 116 *Ga.* 50.    If when the application is made to validate the issue of bonds it appears to the judge, either from the pleadings or otherwise, that the authorities of the municipality or county do not intend to make provision for the payment of the bonds in the manner required by the constitution, of course he should not render a judgment validating the issue of bonds.    In the case of *Wilkins* v. *Waynesboro,* 116 *Ga.* 359, it appeared, not only that the city authorities did not intend to make provision in the manner provided by the constitution, but that the legislative authority for the issuance of the bonds was based upon a scheme for the payment of the same which was in direct violation of the constitution.    Of course, in such a case a judgment refusing validation was the only proper judgment that could have been rendered.    If the municipal authorities, after the issue of bonds has been validated, are proceeding to sell the same without making provision for the payment required by the constitution, we see no reason why any taxpayer should not resort to a court of equity to enjoin the sale of the bonds until the constitutional requirements have been met.    If the bonds have been sold, and the money received by the municipal authorities, and no provision has been made for their payment, we can now see no reason why a taxpayer, even if not the holder of any bonds, might not apply for a mandamus to compel the city authorities to make provision for the payment in the manner prescribed by law.    The policy of the constitution of 1877 is that debts incurred by municipalities and counties shall be paid off within at least thirty years from the date of the incurring of such indebtedness.    There is nothing in the constitution which contemplates that a municipality or county can issue new bonds at the end of thirty years, or any other period less than that in which the principal is to mature, for the purpose of paying the principal of such bonds, where the original debt was incurred subsequently to the adoption of the present constitution.    The policy of the constitution is against the incurring of debts, except in cases where it is necessary, and that in such cases a debt incurred shall be discharged at its maturity.    This is clearly pointed out by Mr. Chief Justice Jackson, in *Walsh* v. *Augusta,* 67 *Ga.* 293.

The constitution does not contemplate for one moment that a debt incurred by a municipality or county since the adoption of

the constitution shall be renewed after the principal matures. The taxpayer, under the policy of that instrument, is to pay an amount each year sufficient to discharge the accruing interest on the debt and a sufficient part of the principal to make in the aggregate an amount sufficient to discharge the debt when it matures. Payment of the principal may be postponed to one year, two years, or even the end of the thirty-year limit, but no further extension can be made; and no matter what be the period fixed by the municipality in its discretion in which the bonds are to be paid, and no matter when the bonds mature within this period, the terms of the constitution are mandatory,—there shall be each year levied a tax which shall be sufficient in amount to pay the interest due during the current year, as well as any part of the principal that may mature during that year; and also a sufficient amount in addition to these items to make a sinking fund which by the end of the bond period will be sufficient to discharge the entire principal of the debt. See *Dawson Waterworks* case, 106 *Ga.* 707–8. The controlling idea is that the purchaser of a municipal or county bond can be assured that his bond will be paid at maturity. It is said, though, that the accumulation of a large fund in the hands of municipal officers, to be held by them for a long period, is a temptation to use it in the meantime for other purposes; and that even if a sinking fund is raised in the manner prescribed by the constitution, it will be diverted from its true channel, and that at the end of the bond period the taxpayer will not only have to pay the bonds, but also lose his annual payments that have been made. The answer of course to this is, that the constitution requires it, and the municipal authorities must not divert funds raised for this purpose to any other purpose. If they are tempted to do it, they should at least be restrained by their oath of office; and if this does not impose a sufficient restraint upon their conduct, it may be well for them to keep in mind that the legislature has declared in no uncertain terms that any officer of a municipal corporation who shall apply any portion of a fund collected by taxation for the purpose of paying the public debt to any other obligation of the city is guilty of malpractice in office. Political Code, § 721. It appears in the record in this case that the town of Calhoun is not providing a sinking fund for the payment of bonds which have been heretofore issued. It may be that there are other cities and

towns that are likewise disregarding the plain mandates of the constitution. If this is true, when the bond period is at an end, the taxpayers will be confronted with a debt which they will have to meet by taxation; for there is no provision in the constitution of 1877 for a new debt to be incurred to take up bonds issued as evidences of an indebtedness incurred since the adoption of the constitution. It may be that the holders of bonds have little interest in this matter; but the taxpayers have great interest, especially those who may be taxpayers at the end of the bond period; and it is certainly well for those who may be thus interested to take whatever steps the law authorizes to require the municipalities to comply with the constitution and provide a fund to discharge, in the manner prescribed in the constitution, the debt they have incurred.

13. Another objection set up was that the notice of registration for the election was illegal, because it did not specify what election was to be held, that at the time the registration books were opened no call for the bond election had been made, and that the notice did not state when the registration books would close. The charter of the town of Calhoun provides "that the mayor and aldermen of said town shall have power to provide for the registration of voters prior to any municipal election in said town, to make all needful laws and regulations for the same, and require that no person be permitted to vote unless registered; *provided, however*, that the books of registration shall always be opened at least sixty days immediately preceding any election which may be held in said town, and be closed ten days before such election." Acts 1901, p, 341, sec. 4. It appears from the record that the town authorities had passed an ordinance which provided that the registration books should be opened at least sixty days immediately preceding any election held in the town, and close ten day before the election. The notice published stated that the books of registration would be opened on the 11th day of March, 1902, and would remain open for a period of sixty days from that date. The election was held on the 24th day of May, 1902. The ordinance, following the charter, prescribed that the books should be closed ten days before the election. So far as the opening of the books was concerned, the notice providing that they should be opened on the 11th day of March was a substantial compliance

with the charter. As both the charter and ordinance distinctly provided that the books should be opened at the least sixty days before the election and be closed ten days before the election, when the books were opened, no matter at what time, they should have been kept open until ten days before the election. While there is language in the published notice which might indicate that the registration list would be closed at a time prior to the election which would be more than ten days, still, as this would have been in violation of the charter and the ordinance, it will not be presumed, in the absence of proof to the contrary, that the town authorities illegally closed the registration books. There is no evidence that the books of registration were illegally closed before the time when the town authorities were authorized by law to close them, nor is there any evidence that any qualified voter of the town was misled by the notice as to his right to register. Under such circumstances, the defect in the notice will not be sufficient to invalidate the election. See in this connection, *Weil* v. *Calhoun*, 25 Fed. 865 (7), 866 (11).

14. Objection was made that the ordinance providing for the registration of voters was illegal, because it was therein provided that if the two registrars disagreed as to whether any person was entitled to register, they might call in as an umpire any citizen of the town, whose decision should be final. It is contended that this provision of the ordinance contravened the laws of the State and the provisions of the charter of the town. The charter authorizes the town authorities "to make all needful laws and regulations" for the registration of voters. Under this grant of power they had a right to make reasonable rules and regulations providing how it should be ascertained whether any one was entitled to register; and an ordinance providing, as the present ordinance does, that two members of the council shall be registrars to determine the question, and that if these two disagree they may call in an umpire, who shall be a citizen of the town, is a needful regulation within the meaning of the charter, and reasonable in its terms.

15. Another ground of objection set up was, that the charter and ordinance provided that ten days should intervene between the close of the registration books and the election, and that the books were closed on the 14th day of May and the election held on the 24th. It is not necessary to determine whether the closing of the

books on the 14th of May was a violation of the charter and ordinance, for the reason, as has already been shown, that there was no evidence offered to substantiate this ground of objection. One who intervenes and interposes an objection to the validation of bonds, which rests upon matters which do not appear in the pleadings, but are dependent for their existence upon aliunde evidence, carries the burden of introducing evidence to substantiate the truth of his allegations. In the absence of proof, the presumption is that the books were opened and closed in conformity to law. There was no evidence to the contrary in the present instance.

16. Still another ground of objection was that fourteen persons were allowed to vote who were not qualified voters. This ground was stricken on demurrer. This was proper, for the reason that if these fourteen votes be entirely eliminated, the number of votes remaining in favor of the issuance of bonds was more than two thirds of the registered vote. See *Weil* v. *Calhoun*, supra.

17. It is contended that the bonds should not have been validated, because at least thirty-two negro voters who voted in favor of the issuance of bonds were induced to do so by false and fraudulent statements made to them by officers of the town and others interested in the issuance of the bonds. This is no ground for refusing to validate the issue of the bonds. The courts can not inquire into the motives prompting persons to vote on questions of this character, where the voter freely and voluntarily exercised his right. Inducements held out to influence a voter, although false and fraudulent, will not invalidate the election. The rule might be different where it appeared that by force and fraud the voter was compelled to vote in a way he did not desire to vote. The allegation of the objection in the present case did not bring the case within the purview of this last statement, even if that would be the rule. Where the election is regularly called and regularly held, and the voters freely and voluntarily exercise their right to vote, the election will not be invalidated simply because some of them may have been misled by some one interested in the result of the election.

18. Another reason interposed as an objection to a judgment of validation being rendered was that the mayor and aldermen had entered into a contract to sell the bonds at private sale at only two per cent. premium; and that the bonds could be sold at a higher

price than this, if bids were had for the same.    This set up no sufficient reason for refusing to validate the issue of bonds, and was properly stricken on demurrer.    Questions of this character can not properly be raised on an application to validate the issue of bonds.   The. manner in which the bonds shall be sold, and the price, are questions left to the sound discretion of the town authorities, unless there is something in the charter or ordinances to the contrary; and even if the sale at a given price is contrary to the charter and ordinances, the remedy of the taxpayer or other person interested is by injunction to prevent the sale after their validation, and not to interpose an objection to their validation. But even if the ground set up in the present case had been urged as a ground for injunction, it would have been ineffectual, because it is not charged that the town authorities were acting in bad faith or collusively and corruptly.    No reason has been shown why the judgment of validation should be reversed.

*Judgment in each case affirmed.    By five Justices.*