## CITY OF COCHRAN *et al. v.* LANFAIR.

1. The act of February 28, 1874 (Acts 1874, p. 109), which declared that the ad valorem tax to be levied and collected by municipalities for ordinary current expenses should not exceed one half of one per cent. upon the value of property (except as therein provided), by express terms excluded the City of Savannah from its operation, and was not territorially general in its operation. Accordingly the legislature were not prevented, by the clause of the constitution of 1877 touching general and special laws, from excepting other municipalities and allowing them, by charter provisions, to levy a different rate.

2. The omission from the Code of 1895 and that of 1910 of the provision of the act of 1874 declaring that it should not apply to the City of Savannah, and the adoption of each of those codes, when considered in the light of the general duty of the codifiers, the origin of the section so codified, and the legislative intent as evidenced by the uniform practice of that department of the government, will not be held to have changed the entire nature of the law as enacted, to have repealed all provisions on that subject contained in the municipal charters granted by the legislature between 1874 and 1895, and also prior to 1910, and to have rendered unconstitutional all such provisions in charters granted since 1895.

3. The charter of the City of Cochran provides that where an execution for municipal taxes is levied on real estate, it shall be sold either by the marshal or the sheriff in front of the door of the county court-house, after being advertised as provided for sheriff's sales. No attack was made on the validity of this provision. Therefore such a sale will not be enjoined on the ground that the marshal had no authority to make it, and that it was advertised in a newspaper published at the county seat.

4. It was alleged that the levy of the execution was excessive, that the total tax amounted to $38.57 (the execution being personal and not for the tax due on the lot alone), and that the property levied on was worth $500, was near the center of the city, and was readily capable of being subdivided and sold in lots, instead of being sold as a whole. The allegations of the petition were admitted. The presiding judge, to whom the case was submitted without a jury, granted an injunction. It is affirmed on this ground alone.

(*a*) Direction is given that the judgment be amended so as to show that it rests solely on the ground of the excessiveness of the levy, and to limit the injunction to selling under such levy.

JANUARY 16, 1913.

Injunction. Before Judge Martin. Pulaski superior court. August 13, 1912.

Mrs. J. J. Lanfair filed her petition against the City of Cochran and its marshal, alleging in substance as follows: The City of Cochran issued a fi. fa. for municipal taxes for the year 1911, including therein $17.91 tax for general municipal expenses, $11.02 school tax, and $9.64 bond tax. The marshal has levied the execution on certain described land, and has advertised the property for sale before the door of the county court-house in Hawkinsville. Unless enjoined he will sell it for the taxes thus assessed against the plaintiff, with interest thereon. The execution is proceeding illegally, and the sale will be void, for the following reasons: (1) "Said levy is excessive, and petitioner alleges that the value of the real estate described is far in excess of the amount of the fi. fa., said property being worth the sum of $500, and it is easily divisible, and capable of being sold in small tracts, suitable for building lots. It is shown that said property is located within one fourth mile from the center of said corporation limits, and is of large value for building purposes." (2) The execution is illegal and proceeding illegally, because the tax levy on which it is based is illegal. Such levy includes a tax of six and one half mills for the purpose of meeting the general expenses of the city; that is, for current or ordinary expenses. In addition thereto the city has levied, for the year 1911, a tax of four mills for the purpose of meeting the expenses of a free public-school system, and also an additional tax of two and one half mills for the purpose of creating a sinking fund for the payment of the principal and interest of its bonded indebtedness,—the two latter items of taxation being for purposes known as extraordinary. The city is attempting to collect taxes of six and one half dollars on the one thousand dollars of assessed valuation of property for current and ordinary expenses of the municipality, and also an additional sum of six and one half dollars on the one thousand dollars of property valuation for expenses other than the current or ordinary expenses, and known as extraordinary expenses. This is in violation of the laws of the State, and especially of paragraphs 2 and 3 of section 865 of

the Civil Code, in that the levy and assessment of the tax for extraordinary expense was not separately made and collected, and said fi. fa. is proceeding for the collection of the entire tax of said municipality, as well for extraordinary as ordinary expenses. (3) Plaintiff alleges that the marshal of the City of Cochran is not authorized to sell the property before the court-house door in the City of Hawkinsville, and by virtue of his office has no authority beyond the limits of the City of Cochran, and the contemplated sale would be illegal and void. (4) The advertisement of the sale is being published in a newspaper published in the City of Hawkinsville; and if the marshal had the authority to make the sale of the property, the advertisement is proceeding irregularly, and the sale thereunder would be void. It would cast a cloud upon the title of plaintiff, and would involve the title in litigation, and give rise to a multiplicity of suits, and cause irreparable damage. It was prayed that the City of Cochran and its marshal be permanently enjoined from selling the property by virtue of the tax levy and the execution based thereon.

The defendants demurred to the petition generally, and also specially demurred to the allegations in regard to the amount of the assessment for ordinary and extraordinary expenses, and those setting up that the levy and assessment of the tax for each extraordinary expense was not separately made and collected. The demurrer was overruled, except as to the allegations touching the want of separation in the levy. As to these it was sustained.

When the case came on for trial, a judgment was entered which recited that, the allegations in the petition "having been admitted by defendants," a permanent injunction was granted. The defendants excepted.

*H. F. Lawson,* for plaintiffs in error.

*H. E. Coates* and *L. A. Whipple,* contra.

LUMPKIN, J. (After stating the foregoing facts.)

1, 2. The leading question presented in this case is of far-reaching importance to the municipalities of the State, and of no little difficulty of solution. On February 28, 1874, an act of the legislature was approved (Acts 1874, p. 109), having the following caption: "An act to limit and regulate the assessment and collection of taxes by municipal authorities in this State, except so far as relates to the City of Savannah." The first section de-

clared that it should be unlawful for the authorities of any municipal corporation to levy or collect for its ordinary current expenses, except as therein otherwise provided, any ad valorem tax upon the property within said corporation, except one half of one per cent. upon the value of such property, "any law of this State, or charter of said corporation, to the contrary notwithstanding." The second section defined ordinary and extraordinary expenses, and made provision for the separate levy and assessment of taxes in addition to one half of one per cent., and for the keeping of separate accounts. Section third declared that it should be malpractice in office on the part of any officer to apply any fund collected for any one of the extraordinary expenses to any other ordinary or extraordinary expense. Section four made provision in regard to the raising of an additional tax when authorized by a vote of the people. Section five declared that nothing in the act contained should interfere with the collection of any ad valorem tax which had already been levied and assessed by the municipal authorities of any city or town for the current year 1874. Section six was as follows: "Be it further enacted, that the provisions of this act shall not in any manner apply to the City of Savannah." This act was incorporated in the Code of 1882 in sections 1672 (a) et seq. The provision that the law should not apply to the City of Savannah appears in section 1672 (e). That code was not formally adopted. In the Code of 1895, the provisions of the act of 1874 were codified in sections 719 to 722 of the Political Code. These sections included sections 1672 (a) to 1672 (d) of the Code of 1882. In some manner the section of the act which appeared in the Code of 1882 as section 1672 (e), and which declared that the provisions of the act should not apply to the City of Savannah, was omitted from the Code of 1895. That code was adopted and made of force as the Code of Georgia (Acts 1895, p. 98). Again, in the Code of 1910 the provisions of the act of 1874 appear codified as in the Code of 1895, omitting the declaration in regard to Savannah. Civil Code, §§ 864-867. This code was also adopted (Acts 1910, p. 48).

As the act of 1874 was passed by the legislature, it was not one territorially general. By excepting the City of Savannah, it did not have uniform operation throughout the State; and the clause of the constitution of 1877 which declares that no special law shall

be enacted in any case for which provision has been made by an existing general law (Civil Code of 1910, § 6391) did not prevent the legislature from authorizing other municipal corporations, by charters granted to them or amendments to their charters, to levy taxes at a different rate from that fixed in the act mentioned. *Lorentz & Rittler* v. *Alexander,* 87 *Ga.* 444 (13 S. E. 632). If the omission from the Code of 1895, and that of 1910, of the declaration that the City of Savannah should not be affected by the act, and the adoption of each of those codes by the legislature, operated as a repeal of that provision, and changed what was previously not a general law into one which was general with uniform operation throughout the State, in spite of charter provisions, then the result would be that the provision of every municipal charter in the State which authorized a rate of taxation different from that mentioned in the law as thus codified would be repealed; and a general law on the subject having been enacted, any later special law differing therefrom would be void.

The effect of codification and the adoption of the code upon laws already existing, in amending or repealing them, has been considered a number of times by this court. What has been said in discussing cases does not appear entirely harmonious. In some instances it has been held that an omission from a section of the code of words or clauses contained in a preceding act of the legislature indicated an intention to change the prior law, or an actual change inconsistent therewith, and that the adoption of the code containing such a change worked an alteration in the law. By the act of 1859 (Acts 1859, p. 48) it was declared: "No suit against a railroad company in this State shall hereafter be dismissed for want of jurisdiction in the court in the county in which said suit may be pending, or hereafter brought; provided the road of such company is located in, or shall run through, the county in which such suit is or may be pending; provided further, the cause of action arose, or the contract was made, or to be performed in the county where the suit was instituted." Section 3313 of the Code of 1863 (which was also adopted by the legislature) declared the general rule as to venue to be that "all civil cases in law (except as hereinafter provided) shall be tried in the county wherein the defendant resides." Section 3317 of that code, which dealt with the jurisdiction of suits against railroad companies, stated that they

were "liable to be sued in any county in which the cause of action originated, by any one whose person or property has been injured by such railroad company, their officers, agents, or employees, in or by the running of the cars or engines, for the purpose of recovering damages for such injury; and also on all contracts to be performed in the county where suit is brought." In *Georgia Railroad & Banking Co.* v. *Kirkpatrick,* 35 *Ga.* 144, it was held that the act of 1859, except so far as incorporated in the code, was repealed, and that an action for trespass upon land could not be brought against a railroad company except in the county where the principal office of the company was located. It may be worthy of note that the commissioners who prepared the original code had a somewhat wide field to cover. They had no prior code to take as a basis from which to start, and which they could add to or subtract from, as might be necessary. They had before them the whole common law, the constitution, the statutes of this State and those of England of force here, and the decisions of the Supreme Court. Their work, when completed, and adopted by the legislature, was given much weight, even where there might be a difference of opinion as to the reason for the omission of certain matters.

In the fourth section of the act of 1856 it was declared that for the negligent killing of a person by a railroad company, when there was no widow, child or children, the right of action was vested in the legal representative of the decedent. As codified in the original code (§ 2913) it was declared that "A widow, or if no widow a child or children, may recover for the homicide of the husband or parent." The words, "if no child or children, it shall vest in his legal representatives," were omitted. In *Miller* v. *Southwestern Railroad Co.,* 55 *Ga.* 143, it was held by two Judges that this operated to limit the right to recover for the homicide of another to the widow or child of the deceased.

By the act of 1854 it was declared what officials might attest a deed for the purpose of record. One of these was a clerk of the inferior court. The code, as adopted, omitted that official from among those whose attestation would suffice to authorize record. It was held that the difference between the code and the act was not attributable to oversight or mistake, but to an obvious purpose to change a prior law, the whole subject being deliberately considered and dealt with by the codifiers; and that the code would control. *Kennedy* v. *McCardel,* 88 *Ga.* 454 (14 S. E. 710).

In *Central of Georgia Ry. Co.* v. *State,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518), the constitutional power of the legislature to adopt and put in force a code as a whole was upheld. It was also held, that though an act might have been originally unconstitutional on account of containing matter different from what was expressed in its title, if otherwise constitutional, it became a valid law by its incorporation in the code and the adoption thereof. Mr. Justice Lewis discussed at some length the subject of codification and the adoption of the code by act of the legislature. In doing so, it was said that the intention of the act adopting the Code of 1895 and making it of force as the Code of Georgia was to enact into one statute all the provisions embraced therein; and also that the effect of that act was to make a part of the law of the State all new matter embodied in the code which could constitutionally be enacted by the legislature. What was said in the discussion of that case, as in others, must be understood in connection with the facts of the case and the points under consideration.

In *Barnes* v. *Carter,* 120 *Ga.* 895 (48 S. E. 387), the court had before it this somewhat singular situation: By an act passed in 1881, it was made the duty of the receiver of tax returns to issue executions against unreturned wild lands. This appears in the Code of 1882 as section 874 (b). In 1882 an act was passed amending the former act by striking therefrom "receiver of tax returns," and inserting in lieu thereof the words "tax-collector." Notwithstanding the amendment, the section of the Code of 1882 was reproduced without change in the Political Code of 1895, § 821, which was adopted by the legislature. Thus it became necessary to hold either that the tax-collector should be declared the proper officer to issue executions, as declared by the act of 1882, or the tax-receiver as declared by the code which had been adopted, or that either could do so. In the opinion of Mr. Justice Evans there is a suggestion that perhaps the amending act of 1882 was unconstitutional, and the original act remained of force. But however this might be, it was held that, under the code, the tax-receiver was the proper officer to act.

On the other hand, section 2126 of the Code of 1863 declared that "The obligation of the surety is accessary to that of his principal, and if the latter from *any cause* [italics ours] becomes ex-

tinct, the former ceases of course, even though it be in judgment." See also Code of 1868, § 2121. A principal was discharged in bankruptcy, and the question arose whether, under this declaration of the code, the surety was also discharged. It was held that he was not. McCay, Judge, in delivering the opinion said: "It must be remembered, that the object of the codification was not to *make* laws, but to *codify* or *declare* those already in existence: Act 9th December, 1858. It is true, that in some instances, the Code has *changed* the law, though these changes are less frequent than is supposed. But, in the main, it can not be doubted that the Code is to be looked at as what it purports to be, a codification of our laws, as they existed at the time, and its provisions are not to be considered as changing the law, unless the intent to change be clear." This statement has frequently been quoted with approval in later decisions.

In *Daniel* v. *Jackson, 53 Ga.* 87, it was held: "That part of the act of 1831 which authorizes a resale at the risk of the purchaser who fails to comply with his bid, made at an executor's, administrator's, or guardian's sale, though not embraced in the code, is still of force in this State." It was said that there was nothing in the act 1831 which was inconsistent with the provision of the code. But it is not easy to see how there was any less inconsistency than that involved in the case of *Georgia Railroad & Banking Co.* v. *Kirpatrick,* supra, or in *Miller* v. *Southwestern Railroad Co.,* supra.

In *City of Atlanta* v. *Gate City Gas Light Co.,* 71 *Ga.* 106, one question was whether the general statement in the code that "No charter shall have any force or effect for a longer period than two years, unless the corporation within that time shall in good faith commence to exercise the powers granted by the act of incorporation," applied to a charter granted by the General Assembly. It was held that it did not. In the opinion Mr. Justice Hall said: "The constitution of 1868, in declaring of force all acts passed by any legislative body, sitting in Georgia as such, since the 19th of January, 1861 (the date of her secession from the United States), including that body of laws known as the 'Code of Georgia' (evidently designating the original code), and the acts amendatory thereof, or passed since that time, which said code and acts are embodied in the printed book known as 'Irwin's Code,' with certain named exceptions, did not surely intend to adopt as law every

inaccuracy that may have crept into that book, especially when such inaccuracy was plainly in conflict with the manifest intention of the legislative bodies whose acts were thus adopted."

In *McDaniel* v. *Campbell, 78 Ga.* 188, it was held that the constitution of 1868, in adopting the code of that year, known as Irwin's Code, and also the acts passed since 1861, did not ratify any unauthorized change in codifying such acts; and that where the act of 1866 made it a part of the offense of abandoning children that they should be left in a "dependent and destitute" condition, a change of the word "and" to "or" in codifying such act was not ratified by the constitution. In *Hardeman* v. *McManus, 83 Ga.* 20 (8 S. E. 733), it was held that the retention in the code of a clause of a section which had been repealed was an error of the compilers, and this error was not cured by the adoption of Irwin's Revised Code by the constitutional convention of 1868; and that in adopting that code the convention did not intend thereby to adopt the errors contained in it.

The language employed in the acts adopting the Codes of 1863, 1895, and 1910 is not identical with that employed in the constitution of 1868, in reference to the Code of 1868, known as Irwin's Code. The acts adopt the codes and put them in force. The constitution of 1868, in declaring what laws were in force in the State, employed the following words: "All acts passed by any legislative body, sitting in this State as such, since the 19th day of January, 1861, including that body of laws known as the Code of Georgia [apparently the original code], and the acts amendatory thereof, or passed since that time, which said code and acts are embodied in a printed book known as 'Irwin's Code,'" etc. But cases arising under the Code of 1868 throw light upon the general proposition that the adoption of a code, or the declaration that it embodies the laws in force, does not necessarily involve the adoption of every error in it.

In *Georgia Railroad & Banking Co.* v. *Wright, 124 Ga.* 596 (53 S. E. 251), it was held that the failure of the compilers of the Code of 1895 to embrace therein the provisions of the act of 1885, giving stock in foreign railroad companies a status for the purpose of taxation in Georgia, did not, in the absence of conflicting statutes in that code, amount to a repeal by implication of the portion of the act referred to; and that it was still the law. In

*Chamblee Lumber Co. v. Crichton,* 136 *Ga.* 391 (71 S. E. 673), the time within which it was necessary to commence a proceeding to foreclose a materialman's lien was under consideration. The provision on that subject was omitted from the Code of 1910 as printed. While the point was not directly involved, as the case had been heard before that code was adopted, Presiding Justice Evans referred to the omission as a mere clerical error, saying: "In transferring this section to the Civil Code of 1910 (§ 3353) certain errors occurred; paragraph 3 was entirely omitted, and paragraph 4 was erroneously numbered 3."

Section 5269, par. 1, of the Code of 1895, on the subject of the competency of witnesses, was amended by the act of 1900 (Acts 1900, p. 57) by adding the words, "Whether such transactions or communications were had by such insane or deceased person with the party testifying, or with any other person." In *Wilder* v. *Wilder,* 138 *Ga.* 573 (6), 574 (75 S. E. 655), this amendment was treated as being in force, though it was omitted from the Code of 1910. See also *Mechanics Bank* v. *Heard,* 37 *Ga.* 401, 412-414; *Gardner, Dexter & Co.* v. *Moore, Trimble & Co.,* 51 *Ga.* 268, 269; *Westmoreland* v. *Powell,* 59 *Ga.* 256; *Gillis* v. *Gillis,* 96 *Ga.* 1, 11 (23 S. E. 107, 30 L. R. A. 143, 51 Am. St. R. 121); *Comer* v. *State,* 103 *Ga.* 69 (29 S. E. 501); *Mitchell* v. *Georgia and Alabama Ry. Co.,* 111 *Ga.* 760, 768-769 (36 S. E. 971, 51 L. R. A. 622); *Mc-Cowan* v. *Brooks,* 113 *Ga.* 384, 388 (39 S. E. 112); *Seaboard Air-Line Ry.* v. *Leader,* 115 *Ga.* 702, 704 (42 S. E. 38); *Smith & Company* v. *Evans,* 125 *Ga.* 109 (53 S. E. 589). It is argued that some of the cases cited involved the construction of sections of the code rather than the effect of omissions therefrom; but a number of them involved the question of whether certain language employed by the codifiers, or the omission of certain words, operated to change the law as it previously stood.

From the foregoing discussion it will be seen that the legislature have power to adopt a code as a whole, but that no arbitrary and inflexible rule has been applied to the determination of whether or not an act or a part of an act omitted from the code was repealed by the adoption of that book. Probably no Procrustean rule can be announced on the subject. The general presumption is that the codifiers codified the laws existing, rather than made new ones. Some changes were undoubtedly made, and were adopted by the

legislature. Some were apparently intentionally made, and some were so palpably changed that they negatived the idea of mere clerical omission, or would breed confusion and conflict with that which was omitted. In other instances it was held not to have been the intention of the legislature to change the law.

In a case like the one before us we think it is legitimate to look to the legislative intent as evidenced by the practice of that department of the government since this act found its way into the Code of 1895 in a mutilated condition. *Solomon* v. *Commissioners of Cartersville,* 41 *Ga.* 157; *Macon and Augusta R. Co.* v. *Lillle,* 45 *Ga.* 370, 380; *County of Pulaski* v. *Thompson & Co.,* 83 *Ga.* 270, 272 (9 S. E. 1065); *Fullington* v. *Williams,* 98 *Ga.* 807, 813 (27 S. E. 183); *Park* v. *Candler,* 114 *Ga.* 466, 500 (40 S. E. 523); *Epping* v. *Columbus,* 117 *Ga.* 263 (7), 273 (43 S. E. 803).

When we refer to the legislative practice, we find that at the session when the Code of 1895 was adopted, and that when the Code of 1910 was adopted, and at almost every session between those dates and since 1910, the legislature has granted to one or more municipal corporations authority to levy a tax at a different rate from that fixed by the act of 1874 as codified. At some sessions several acts of this character were passed. So that it is evident that the legislature did not think that it had made the act of 1874 a territorially general law by adopting the code, and had thus precluded itself, under the constitution, from making special provisions on the subject in the charters of municipal corporations. If such was the effect, then all these charter provisions enacted since 1895, which do not accord with the section of the code under consideration, are void, and no others can be passed. Upon careful consideration, we have arrived at the conclusion that the omission. from the code of the section exempting Savannah from the operation of the act, and the adoption of the code, did not have any such effect. These sections of the code may have an ample field of operation where the legislature does not declare otherwise.

3. Complaint was made that the marshal of the City of Cochran was not authorized to sell the property before the door of the court-house in the City of Hawkinsville. The charter of Cochran provides that either the marshal or the sheriff may make such sales of real estate, and that they shall be at the court-house of the county, after being advertised as provided for sheriff's sales of land under

ordinary executions. Acts 1904, p. 433, § 71. No attack is made on the validity of this provision.

4. . The petition alleged that the levy of the execution was excessive; that the fi. fa. was for $17.91 for taxes for general expenses, $11.02 for school purposes, and $9.64 as bond tax, making an aggregate of $38.57; that the property was located within a quarter of a mile of the center of the corporate limits, was worth $500, and was divisible and capable of being sold in smaller tracts suitable for building lots. The case was submitted to the presiding judge without a jury. The judgment recites that the allegations of fact in the petition were admitted by the defendant. We can not say that the judge erred in holding the levy to be excessive and enjoining the sale on that ground. But direction is given that the judgment be so amended as to show that it rests on that ground alone, and that the injunction is limited to restraining a sale under the present levy.

*Judgment affirmed, with direction. All the Justices concur.*